# MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD, ET AL. *v.* ZENITH RADIO CORP. ET AL.

No. 83–2004.   Argued November 12, 1985—Decided March 26, 1986

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 598.

*Donald J. Zoeller* argued the cause for petitioners. With him on the briefs were *John L. Altieri, Jr., Harold G. Levison, Peter J. Gartland, James S. Morris, Kevin R. Keating, Charles F. Schirmeister, Ira M. Millstein, A. Paul Victor, Jeffrey L. Kessler, Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Donald F. Turner,* and *Henry T. Reath.*

*Charles F. Rule* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Wallace, Charles S. Stark, Robert B. Nicholson, Edward T. Hand, Richard P. Larm, Abraham D. Sofaer,* and *Elizabeth M. Teel.*

*Edwin P. Rome* argued the cause for respondents. With him on the brief were *William H. Roberts, Arnold I. Kalman, Philip J. Curtis,* and *John Borst, Jr.**

JUSTICE POWELL delivered the opinion of the Court.

This case requires that we again consider the standard district courts must apply when deciding whether to grant summary judgment in an antitrust conspiracy case.

## I

Stating the facts of this case is a daunting task. The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the District Court is more than three times as long. *In re Japanese Electronic Products*

---

*Briefs of *amici curiae* urging reversal were filed for the Government of Japan by *Stephen M. Shapiro;* and for the American Association of Exporters and Importers et al. by *Robert Herzstein* and *Hadrian R. Katz.*

Briefs of *amici curiae* were filed for the Government of Australia et al. by *Mark R. Joelson* and *Joseph P. Griffin;* and for the Semiconductor Industry Association by *Joseph R. Creighton.*

*Antitrust Litigation,* 723 F. 2d 238 (CA3 1983); 513 F. Supp.
1100 (ED Pa. 1981). Two respected District Judges each
have authored a number of opinions in this case; the pub-
lished ones alone would fill an entire volume of the Federal
Supplement. In addition, the parties have filed a 40-volume
appendix in this Court that is said to contain the essence of
the evidence on which the District Court and the Court of
Appeals based their respective decisions.

We will not repeat what these many opinions have stated
and restated, or summarize the mass of documents that con-
stitute the record on appeal. Since we review only the
standard applied by the Court of Appeals in deciding this
case, and not the weight assigned to particular pieces of evi-
dence, we find it unnecessary to state the facts in great de-
tail. What follows is a summary of this case's long history.

## A

Petitioners, defendants below, are 21 corporations that
manufacture or sell "consumer electronic products" (CEPs)—
for the most part, television sets. Petitioners include both
Japanese manufacturers of CEPs and American firms, con-
trolled by Japanese parents, that sell the Japanese-
manufactured products. Respondents, plaintiffs below, are
Zenith Radio Corporation (Zenith) and National Union Elec-
tric Corporation (NUE). Zenith is an American firm that
manufactures and sells television sets. NUE is the corpo-
rate successor to Emerson Radio Company, an American
firm that manufactured and sold television sets until 1970,
when it withdrew from the market after sustaining substan-
tial losses. Zenith and NUE began this lawsuit in 1974,[1]
claiming that petitioners had illegally conspired to drive

---

[1] NUE had filed its complaint four years earlier, in the District Court for
the District of New Jersey. Zenith's complaint was filed separately in
1974, in the Eastern District of Pennsylvania. The two cases were con-
solidated in the Eastern District of Pennsylvania in 1974.

American firms from the American CEP market. According to respondents, the gist of this conspiracy was a "'scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [petitioners] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States.'" 723 F. 2d, at 251 (quoting respondents' preliminary pretrial memorandum). These "low prices" were allegedly at levels that produced substantial losses for petitioners. 513 F. Supp., at 1125. The conspiracy allegedly began as early as 1953, and according to respondents was in full operation by sometime in the late 1960's. Respondents claimed that various portions of this scheme violated §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, § 73 of the Wilson Tariff Act, and the Antidumping Act of 1916.

After several years of detailed discovery, petitioners filed motions for summary judgment on all claims against them. The District Court directed the parties to file, with preclusive effect, "Final Pretrial Statements" listing all the documentary evidence that would be offered if the case proceeded to trial. Respondents filed such a statement, and petitioners responded with a series of motions challenging the admissibility of respondents' evidence. In three detailed opinions, the District Court found the bulk of the evidence on which Zenith and NUE relied inadmissible.[2]

The District Court then turned to petitioners' motions for summary judgment. In an opinion spanning 217 pages, the court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged

---

[2] The inadmissible evidence included various government records and reports, *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, 505 F. Supp. 1125 (ED Pa. 1980), business documents offered pursuant to various hearsay exceptions, *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, 505 F. Supp. 1190 (ED Pa. 1980), and a large portion of the expert testimony that respondents proposed to introduce. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, 505 F. Supp. 1313 (ED Pa. 1981).

conspiracy. At bottom, the court found, respondents' claims rested on the inferences that could be drawn from petitioners' parallel conduct in the Japanese and American markets, and from the effects of that conduct on petitioners' American competitors. 513 F. Supp., at 1125–1127. After reviewing the evidence both by category and *in toto*, the court found that any inference of conspiracy was unreasonable, because (i) some portions of the evidence suggested that petitioners conspired in ways that did not injure respondents, and (ii) the evidence that bore directly on the alleged price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market and not to monopolize it. Summary judgment therefore was granted on respondents' claims under § 1 of the Sherman Act and the Wilson Tariff Act. Because the Sherman Act § 2 claims, which alleged that petitioners had combined to monopolize the American CEP market, were functionally indistinguishable from the § 1 claims, the court dismissed them also. Finally, the court found that the Robinson-Patman Act claims depended on the same supposed conspiracy as the Sherman Act claims. Since the court had found no genuine issue of fact as to the conspiracy, it entered judgment in petitioners' favor on those claims as well.[3]

---

[3] The District Court ruled separately that petitioners were entitled to summary judgment on respondents' claims under the Antidumping Act of 1916. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.*, 494 F. Supp. 1190 (ED Pa. 1980). Respondents appealed this ruling, and the Court of Appeals reversed in a separate opinion issued the same day as the opinion concerning respondents' other claims. *In re Japanese Electronic Products Antitrust Litigation*, 723 F. 2d 319 (CA3 1983).

Petitioners ask us to review the Court of Appeals' Antidumping Act decision along with its decision on the rest of this mammoth case. The Antidumping Act claims were not, however, mentioned in the questions presented in the petition for certiorari, and they have not been independently argued by the parties. See this Court's Rule 21.1(a). We therefore decline the invitation to review the Court of Appeals' decision on those claims.

## B

The Court of Appeals for the Third Circuit reversed.[4] The court began by examining the District Court's evidentiary rulings, and determined that much of the evidence excluded by the District Court was in fact admissible. 723 F. 2d, at 260–303. These evidentiary rulings are not before us. See 471 U. S. 1002 (1985) (limiting grant of certiorari).

On the merits, and based on the newly enlarged record, the court found that the District Court's summary judgment decision was improper. The court acknowledged that "there are legal limitations upon the inferences which may be drawn from circumstantial evidence," 723 F. 2d, at 304, but it found that "the legal problem . . . is different" when "there is direct evidence of concert of action." *Ibid.* Here, the court concluded, "there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred." *Id.*, at 304–305. Thus, the court reasoned, cases concerning the limitations on inferring conspiracy from ambiguous evidence were not dispositive. *Id.*, at 305. Turning to the evidence, the court determined that a factfinder reasonably could draw the following conclusions:

1. The Japanese market for CEPs was characterized by oligopolistic behavior, with a small number of producers meeting regularly and exchanging information on price and other matters. *Id.*, at 307. This created the opportunity for a stable combination to raise both prices and profits in Japan. American firms could not attack such a combination because the Japanese Government imposed significant barriers to entry. *Ibid.*

2. Petitioners had relatively higher fixed costs than their American counterparts, and therefore needed to

---

[4] As to 3 of the 24 defendants, the Court of Appeals affirmed the entry of summary judgment. Petitioners are the 21 defendants who remain in the case.

operate at something approaching full capacity in order to make a profit. *Ibid.*

3. Petitioners' plant capacity exceeded the needs of the Japanese market. *Ibid.*

4. By formal agreements arranged in cooperation with Japan's Ministry of International Trade and Industry (MITI), petitioners fixed minimum prices for CEPs exported to the American market. *Id.*, at 310. The parties refer to these prices as the "check prices," and to the agreements that require them as the "check price agreements."

5. Petitioners agreed to distribute their products in the United States according to a "five company rule": each Japanese producer was permitted to sell only to five American distributors. *Ibid.*

6. Petitioners undercut their own check prices by a variety of rebate schemes. *Id.*, at 311. Petitioners sought to conceal these rebate schemes both from the United States Customs Service and from MITI, the former to avoid various customs regulations as well as action under the antidumping laws, and the latter to cover up petitioners' violations of the check-price agreements.

Based on inferences from the foregoing conclusions,[5] the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent and not conspiratorial.

---

[5] In addition to these inferences, the court noted that there was expert opinion evidence that petitioners' export sales "generally were at prices which produced losses, often as high as twenty-five percent on sales." 723 F. 2d, at 311. The court did not identify any direct evidence of below-cost pricing; nor did it place particularly heavy reliance on this aspect of the expert evidence. See n. 19, *infra*.

The court found it unnecessary to address petitioners' claim that they could not be held liable under the antitrust laws for conduct that was compelled by a foreign sovereign. The claim, in essence, was that because MITI required petitioners to enter into the check-price agreements, liability could not be premised on those agreements. The court concluded that this case did not present any issue of sovereign compulsion, because the check-price agreements were being used as "evidence of a low export price conspiracy" and not as an independent basis for finding antitrust liability. The court also believed it was unclear that the check prices in fact were mandated by the Japanese Government, notwithstanding a statement to that effect by MITI itself. *Id.*, at 315.

We granted certiorari to determine (i) whether the Court of Appeals applied the proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment, and (ii) whether petitioners could be held liable under the antitrust laws for a conspiracy in part compelled by a foreign sovereign. 471 U. S. 1002 (1985). We reverse on the first issue, but do not reach the second.

## II

We begin by emphasizing what respondents' claim is *not*. Respondents cannot recover antitrust damages based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies. *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 443 (CA2 1945) (L. Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law ¶236d (1978).[6] Nor can respondents recover damages for

---

[6] The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 704 (1962) ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries"). The effect

any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, *United States* v. *Trenton Potteries Co.*, 273 U. S. 392 (1927); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 223 (1940), but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price in CEPs. Cf. *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 488–489 (1977). Finally, for the same reason, respondents cannot recover for a conspiracy to impose non-price restraints that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supra-competitive pricing more attractive. Thus, neither petitioners' alleged supracompetitive pricing in Japan, nor the five company rule that limited distribution in this country, nor the check prices insofar as they established minimum prices in this country, can by themselves give respondents a cognizable claim against petitioners for antitrust damages. The Court of Appeals therefore erred to the extent that it found evidence of these alleged conspiracies to be "direct evidence" of a conspiracy that injured respondents. See 723 F. 2d, at 304–305.

---

on which respondents rely is the artificially depressed level of prices for CEPs in the United States.

Petitioners' alleged cartelization of the Japanese market could not have caused that effect over a period of some two decades. Once petitioners decided, as respondents allege, to reduce output and raise prices in the Japanese market, they had the option of either producing fewer goods or selling more goods in other markets. The most plausible conclusion is that petitioners chose the latter option because it would be more profitable than the former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the Japanese market perfectly competitive petitioners would still have to choose whether to sell goods overseas, and would still presumably make that choice based on their profit expectations. For this reason, respondents' theory of recovery depends on proof of the asserted price-cutting conspiracy in this country.

Respondents nevertheless argue that these supposed conspiracies, if not themselves grounds for recovery of antitrust damages, are circumstantial evidence of another conspiracy that *is* cognizable: a conspiracy to monopolize the American market by means of pricing below the market level.[7] The thrust of respondents' argument is that petitioners used their monopoly profits from the Japanese market to fund a concerted campaign to price predatorily and thereby drive respondents and other American manufacturers of CEPs out of business. Once successful, according to respondents, petitioners would cartelize the American CEP market, restricting output and raising prices above the level that fair competition would produce. The resulting monopoly profits, respondents contend, would more than compensate petitioners for the losses they incurred through years of pricing below market level.

The Court of Appeals found that respondents' allegation of a horizontal conspiracy to engage in predatory pricing,[8]

---

[7] Respondents also argue that the check prices, the five company rule, and the price fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. However one decides to describe the contours of the asserted conspiracy—whether there is one conspiracy or several—respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. *Associated General Contractors of California, Inc.* v. *Carpenters,* 459 U. S. 519, 538–540 (1983); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,* 429 U. S. 477, 488–489 (1977); see also Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale L. J. 1309 (1984). That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury.

[8] Throughout this opinion, we refer to the asserted conspiracy as one to price "predatorily." This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in. *E. g., Southern Pacific Communications Co.* v. *American Telephone & Telegraph Co.,* 238 U. S. App. D. C. 309, 331–336, 740 F. 2d 980, 1002–1007 (1984), cert. denied, 470 U. S. 1005

if proved,[9] would be a *per se* violation of § 1 of the Sherman Act. 723 F. 2d, at 306. Petitioners did not appeal from that conclusion. The issue in this case thus becomes whether respondents adduced sufficient evidence in support of their theory to survive summary judgment. We therefore examine the principles that govern the summary judgment determination.

## III

To survive petitioners' motion for summary judgment,[10] respondents must establish that there is a genuine issue of ma-

(1985). In such cases, "predatory pricing" means pricing below some appropriate measure of cost. *E. g., Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F. 2d 227, 232–235 (CA1 1983); see *Utah Pie Co.* v. *Continental Baking Co.*, 386 U. S. 685, 698, 701, 702, n. 14 (1967).

There is a good deal of debate, both in the cases and in the law reviews, about what "cost" is relevant in such cases. We need not resolve this debate here, because unlike the cases cited above, this is a Sherman Act § 1 case. For purposes of this case, it is enough to note that respondents have not suffered an antitrust injury unless petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices. Respondents therefore may not complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at *any* level.

[9] We do not consider whether recovery should *ever* be available on a theory such as respondents' when the pricing in question is above some measure of incremental cost. See generally Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 709–718 (1975) (discussing cost-based test for use in § 2 cases). As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as this one. See Part IV–A, *infra*.

[10] Respondents argued before the District Court that petitioners had failed to carry their initial burden under Federal Rule of Civil Procedure 56(c) of demonstrating the absence of a genuine issue of material fact. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157 (1970). Cf. *Catrett* v. *Johns-Manville Sales Corp.*, 244 U. S. App. D. C. 160, 756 F. 2d 181,

terial fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. Fed. Rule Civ. Proc. 56(e);[11] *First National Bank of Arizona* v. *Cities Service Co.*, 391 U. S. 253, 288–289 (1968). This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. *Supra*, at 582–583. Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S., at 489, because they actually tended to benefit respondents. *Supra*, at 582–583. Therefore, unless, in context, evidence of these "other" conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.

Second, the issue of fact must be "genuine." Fed. Rules Civ. Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c),[12] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See *DeLuca* v. *Atlantic Refining Co.*, 176 F. 2d 421, 423 (CA2 1949) (L. Hand, J.), cert. denied, 338 U. S. 943 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Prob-

---

cert. granted, 474 U. S. 944 (1985). That issue was resolved in petitioners' favor, and is not before us.

[11] Rule 56(e) provides, in relevant part:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[12] See n. 10, *supra*.

lems in Drafting and Interpreting Procedural Codes and Rules, 3 Vand. L. Rev. 493, 504–505 (1950). Cf. *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U. S. 620, 627 (1944). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed. Rule Civ. Proc. 56(e) (emphasis added). See also Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e), 28 U. S. C. App., p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Cities Service, supra,* at 289.

It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Cities Service* is instructive. The issue in that case was whether proof of the defendant's refusal to deal with the plaintiff supported an inference that the defendant willingly had joined an illegal boycott. Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy. 391 U. S., at 278–279. The Court acknowledged that, in isolation, the defendant's refusal to deal might well have sufficed to create a triable issue. *Id.*, at 277. But the refusal to deal had to be evaluated in its factual context. Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability. *Id.*, at 280.

Respondents correctly note that "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States* v. *Diebold, Inc.*, 369

U. S. 654, 655 (1962). But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.*, at 764. See also *Cities Service, supra*, at 280. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U. S., at 764. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. See *Cities Service, supra*, at 280.

Petitioners argue that these principles apply fully to this case. According to petitioners, the alleged conspiracy is one that is economically irrational and practically infeasible. Consequently, petitioners contend, they had no motive to engage in the alleged predatory pricing conspiracy; indeed, they had a strong motive *not* to conspire in the manner respondents allege. Petitioners argue that, in light of the absence of any apparent motive and the ambiguous nature of the evidence of conspiracy, no trier of fact reasonably could find that the conspiracy with which petitioners are charged actually existed. This argument requires us to consider the nature of the alleged conspiracy and the practical obstacles to its implementation.

IV

A

A predatory pricing conspiracy is by nature speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational,

the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

> "Any realistic theory of predation recognizes that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of the losses." R. Bork, The Antitrust Paradox 145 (1978).

See also McGee, Predatory Pricing Revisited, 23 J. Law & Econ. 289, 295–297 (1980). As this explanation shows, the success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U. Chi. L. Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful. See, *e. g.,* Bork, *supra,* at 149–155; Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 699 (1975); Easterbrook, *supra;* Koller, The Myth of Predatory Pricing—An Empirical Study,

4 Antitrust Law & Econ. Rev. 105 (1971); McGee, Predatory Price Cutting: The *Standard Oil (N. J.) Case*, 1 J. Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J. Law & Econ., at 292–294. See also *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, 651 F. 2d 76, 88 (CA2 1981) ("[N]owhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), cert. denied, 455 U. S. 943 (1982).

These observations apply even to predatory pricing by a *single firm* seeking monopoly power. In this case, respondents allege that a large number of firms have conspired over a period of many years to charge below-market prices in order to stifle competition. Such a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator. The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeeds. The necessary allocation is therefore difficult to accomplish. Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for *all* buyers of CEPs. If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Finally, if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess prof-

its what they earlier gave up in below-cost prices. See *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co., supra,* at 89; Areeda & Turner, 88 Harv. L. Rev., at 698. Two decades after their conspiracy is alleged to have commenced,[13] petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners. 6 App. to Brief for Appellant in No. 81–2331 (CA3), pp. 2575a-2576a. Moreover, those shares, which together approximate 40% of sales, did not decline appreciably during the 1970's. *Ibid.* Petitioners' collective share rose rapidly during this period, from one-fifth or less of the relevant markets to close to 50%. 723 F. 2d, at 316.[14] Neither the District Court nor the Court of Appeals found, however, that petitioners' share presently allows them to charge monopoly prices; to the contrary, respondents contend that the conspiracy is ongoing—that petitioners are still artificially *depressing* the market price in order to drive Zenith out of the market. The data in the record strongly suggest that that goal is yet far distant.[15]

[13] NUE's complaint alleges that petitioners' conspiracy began as early as 1960; the starting date used in Zenith's complaint is 1953. NUE Complaint ¶ 52; Zenith Complaint ¶ 39.

[14] During the same period, the number of American firms manufacturing television sets declined from 19 to 13. 5 App. to Brief for Appellant in No. 81–2331 (CA3), p. 1961a. This decline continued a trend that began at least by 1960, when petitioners' sales in the United States market were negligible. *Ibid.* See Zenith Complaint ¶¶ 35, 37.

[15] Respondents offer no reason to suppose that entry into the relevant market is especially difficult, yet without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time. Judge Easterbrook, commenting on this case in a law review article, offers the following sensible assessment:

"The plaintiffs [in this case] maintain that for the last fifteen years or more at least ten Japanese manufacturers have sold TV sets at less than cost in order to drive United States firms out of business. Such conduct cannot possibly produce profits by harming competition, however. If the Japanese firms drive some United States firms out of business, they could not

The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist. Since the losses in such a conspiracy accrue before the gains, they must be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the conspirators could well require a correspondingly long time to recoup. Maintaining supracompetitive prices in turn depends on the continued cooperation of the conspirators, on the inability of other would-be competitors to enter the market, and (not incidentally) on the conspirators' ability to escape antitrust liability for their *minimum* price-fixing cartel.[16] Each of these factors weighs more heavily as the time needed to recoup losses grows. If the losses have been substantial—as would likely be neces-

---

recoup. Fifteen years of losses could be made up only by very high prices for the indefinite future. (The losses are like investments, which must be recovered with compound interest.) If the defendants should try to raise prices to such a level, they would attract new competition. There are no barriers to entry into electronics, as the proliferation of computer and audio firms shows. The competition would come from resurgent United States firms, from other foreign firms (Korea and many other nations make TV sets), and from defendants themselves. In order to recoup, the Japanese firms would need to suppress competition among themselves. On plaintiffs' theory, the cartel would need to last at least thirty years, far longer than any in history, even when cartels were not illegal. None should be sanguine about the prospects of such a cartel, given each firm's incentive to shave price and expand its share of sales. The predation recoupment story therefore does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition." Easterbrook, The Limits of Antitrust, 63 Texas L. Rev. 1, 26–27 (1984) (footnotes omitted).

[16] The alleged predatory scheme makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price fixing *after* they have succeeded in driving competitors from the market. Such price fixing would, of course, be an independent violation of § 1 of the Sherman Act. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940).

sary in order to drive out the competition[17]—petitioners would most likely have to sustain their cartel for years simply to break even.

Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off. The courts below found no evidence of any such success, and—as indicated above—the facts actually are to the contrary: RCA and Zenith, not any of the petitioners, continue to hold the largest share of the American retail market in color television sets. More important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market. In the absence of any such evidence, the possible existence of supracompetitive profits in Japan simply cannot overcome the economic obstacles to the ultimate success of this alleged predatory conspiracy.[18]

## B

In *Monsanto*, we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto*, 465 U. S., at 762–764.

---

[17] The predators' losses must actually *increase* as the conspiracy nears its objective: the greater the predators' market share, the more products the predators sell; but since every sale brings with it a loss, an increase in market share also means an increase in predatory losses.

[18] The same is true of any supposed excess production capacity that petitioners may have possessed. The existence of plant capacity that exceeds domestic demand does tend to establish the ability to sell products abroad. It does not, however, provide a motive for selling at prices lower than necessary to obtain sales; nor does it explain why petitioners would be willing to *lose* money in the United States market without some reasonable prospect of recouping their investment.

Respondents, petitioners' competitors, seek to hold petitioners liable for damages caused by the alleged conspiracy to cut prices. Moreover, they seek to establish this conspiracy indirectly, through evidence of other combinations (such as the check-price agreements and the five company rule) whose natural tendency is to raise prices, and through evidence of rebates and other price-cutting activities that respondents argue tend to prove a combination to suppress prices.[19] But cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. See *Monsanto, supra,* at 763–764. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright Corp.* v. *ITT Grinnell Corp.,* 724 F. 2d 227, 234 (CA1 1983).

In most cases, this concern must be balanced against the desire that illegal conspiracies be identified and punished. That balance is, however, unusually one-sided in cases such as this one. As we earlier explained, *supra,* at 588–593, predatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover, the

---

[19] Respondents also rely on an expert study suggesting that petitioners have sold their products in the American market at substantial losses. The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that in turn rests on assumptions about petitioners' costs. The District Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. *Zenith Radio Corp.* v. *Matsushita Electric Industrial Co.,* 505 F. Supp., at 1356–1363. Although the Court of Appeals reversed the District Court's finding that the expert report was inadmissible, the court did not disturb the District Court's analysis of the factors that substantially undermine the probative value of that evidence. See 723 F. 2d, at 277–282. We find the District Court's analysis persuasive. Accordingly, in our view the expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors, discussed in Part IV–A, *supra,* that suggest that such conduct is irrational.

gains depend on a host of uncertainties, making such schemes more likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. See Easterbrook, The Limits of Antitrust, 63 Texas L. Rev. 1, 26 (1984). Finally, unlike predatory pricing by a single firm, *successful* predatory pricing conspiracies involving a large number of firms can be identified and punished once they succeed, since some form of minimum price-fixing agreement would be necessary in order to reap the benefits of predation. Thus, there is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage such conspiracies.

## V

As our discussion in Part IV–A shows, petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains. Cf. *Cities Service*, 391 U. S., at 279. The Court of Appeals did not take account of the absence of a plausible motive to enter into the alleged predatory pricing conspiracy. It focused instead on whether there was "direct evidence of concert of action." 723 F. 2d, at 304. The Court of Appeals erred in two respects: (i) the "direct evidence" on which the court relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing.

The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents'

claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market—the so-called five company rule. That practice may have facilitated a horizontal territorial allocation, see *United States* v. *Topco Associates, Inc.*, 405 U. S. 596 (1972), but its natural effect would be to raise market prices rather than reduce them.[20] Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible ex-

---

[20] The Court of Appeals correctly reasoned that the five company rule might tend to insulate petitioners from competition with each other. 723 F. 2d, at 306. But this effect is irrelevant to a conspiracy to price predatorily. Petitioners have no incentive to underprice each other if they already are pricing *below* the level at which they could sell their goods. The far more plausible inference from a customer allocation agreement such as the five company rule is that petitioners were conspiring to *raise* prices, by limiting their ability to take sales away from each other. Respondents—petitioners' competitors—suffer no harm from a conspiracy to raise prices. *Supra,* at 582–583. Moreover, it seems very unlikely that the five company rule had any significant effect of any kind, since the "rule" permitted petitioners to sell to their American subsidiaries, and did not limit the number of distributors to which the subsidiaries could resell. 513 F. Supp., at 1190.

planations, the conduct does not give rise to an inference of conspiracy. See *Cities Service, supra,* at 278–280. Here, the conduct in question consists largely of (i) pricing at levels that succeeded in taking business away from respondents, and (ii) arrangements that may have limited petitioners' ability to compete with each other (and thus kept prices from going even lower). This conduct suggests either that petitioners behaved competitively, or that petitioners conspired to *raise* prices. Neither possibility is consistent with an agreement among 21 companies to price below market levels. Moreover, the predatory pricing scheme that this conduct is said to prove is one that makes no practical sense: it calls for petitioners to destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth. Even had they succeeded in obtaining their monopoly, there is nothing in the record to suggest that they could recover the losses they would need to sustain along the way. In sum, in light of the absence of any rational motive to conspire, neither petitioners' pricing practices, nor their conduct in the Japanese market, nor their agreements respecting prices and distribution in the American market, suffice to create a "genuine issue for trial." Fed. Rule Civ. Proc. 56(e).[21]

On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "ten[d] to exclude the possibility" that petitioners underpriced respondents to compete for business rather than to implement an eco-

---

[21] We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co.* v. *Spray-Rite Service Corp.,* 465 U. S. 752 (1984), establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Id.,* at 763–764. See *supra,* at 588.

nomically senseless conspiracy. *Monsanto*, 465 U. S., at 764. In the absence of such evidence, there is no "genuine issue for trial" under Rule 56(e), and petitioners are entitled to have summary judgment reinstated.

## VI

Our decision makes it unnecessary to reach the sovereign compulsion issue. The heart of petitioners' argument on that issue is that MITI, an agency of the Government of Japan, required petitioners to fix minimum prices for export to the United States, and that petitioners are therefore immune from antitrust liability for any scheme of which those minimum prices were an integral part. As we discussed in Part II, *supra*, respondents could not have suffered a cognizable injury from any action that *raised* prices in the American CEP market. If liable at all, petitioners are liable for conduct that is distinct from the check-price agreements. The sovereign compulsion question that both petitioners and the Solicitor General urge us to decide thus is not presented here.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

It is indeed remarkable that the Court, in the face of the long and careful opinion of the Court of Appeals, reaches the result it does. The Court of Appeals faithfully followed the relevant precedents, including *First National Bank of Arizona* v. *Cities Service Co.*, 391 U. S. 253 (1968), and *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752 (1984), and it kept firmly in mind the principle that proof of a conspiracy should not be fragmented, see *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U. S. 690, 699 (1962). After surveying the massive record, including very

significant evidence that the District Court erroneously had excluded, the Court of Appeals concluded that the evidence taken as a whole creates a genuine issue of fact whether petitioners engaged in a conspiracy in violation of §§ 1 and 2 of the Sherman Act and § 2(a) of the Robinson-Patman Act. In my view, the Court of Appeals' opinion more than adequately supports this judgment.

The Court's opinion today, far from identifying reversible error, only muddies the waters. In the first place, the Court makes confusing and inconsistent statements about the appropriate standard for granting summary judgment. Second, the Court makes a number of assumptions that invade the factfinder's province. Third, the Court faults the Third Circuit for nonexistent errors and remands the case although it is plain that respondents' evidence raises genuine issues of material fact.

I

The Court's initial discussion of summary judgment standards appears consistent with settled doctrine. I agree that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Ante,* at 587 (quoting *Cities Service, supra,* at 289). I also agree that "'[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Ante,* at 587 (quoting *United States* v. *Diebold, Inc.,* 369 U. S. 654, 655 (1962)). But other language in the Court's opinion suggests a departure from traditional summary judgment doctrine. Thus, the Court gives the following critique of the Third Circuit's opinion:

"[T]he Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude

that petitioners' price-cutting behavior was independent and not conspiratorial." *Ante*, at 581.

In a similar vein, the Court summarizes *Monsanto Co.* v. *Spray-Rite Service Corp.*, *supra*, as holding that "courts should not permit factfinders to infer conspiracies when such inferences are implausible . . . ." *Ante*, at 593. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury.[1] These holdings in no way under-

---

[1] The Court adequately summarizes the quite fact-specific holding in *Cities Service*. *Ante*, at 587.

In *Monsanto*, the Court held that a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is not, *standing alone*, sufficient to create a jury question. 465 U. S., at 763–764. To understand this holding, it is important to realize that under *United States* v. *Colgate & Co.*, 250 U. S. 300 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate those who fail to comply, but that under *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), it is impermissible for the manufacturer and its distributors to agree on the price at which the distributors will sell the goods. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate*, *unless* the termination is pursuant to a shared understanding between the manufacturer and its distributors respecting enforcement of a resale price maintenance scheme. *Monsanto* holds that to establish liability under *Dr. Miles*, more is needed than evidence of behavior that is consistent with a distributor's exercise of its prerogatives under *Colgate*. Thus, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U. S., at 764. *Monsanto* does *not* hold that if a terminated dealer produces some further evidence of conspiracy beyond the bare fact of postcomplaint termination, the judge hearing a motion for summary judgment should balance all the evidence pointing toward conspiracy against all the evidence pointing toward independent action.

mine the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language.

## II

In defining what respondents must show in order to recover, the Court makes assumptions that invade the factfinder's province. The Court states with very little discussion that respondents can recover under § 1 of the Sherman Act only if they prove that "petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Ante,* at 585, n. 8. This statement is premised on the assumption that "[a]n agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices." *Ibid.* In making this assumption, the Court ignores the contrary conclusions of respondents' expert DePodwin, whose report in very relevant part was erroneously excluded by the District Court.

The DePodwin Report, on which the Court of Appeals relied along with other material, indicates that respondents were harmed in two ways that are independent of whether petitioners priced their products below "the level necessary to sell their products or . . . some appropriate measure of cost." *Ibid.* First, the Report explains that the price-raising scheme in Japan resulted in lower consumption of petitioners' goods in that country and the exporting of more of petitioners' goods to this country than would have occurred had prices in Japan been at the competitive level. Increas-

ing exports to this country resulted in depressed prices here, which harmed respondents.[2] Second, the DePodwin Report indicates that petitioners exchanged confidential proprietary information and entered into agreements such as the five company rule with the goal of avoiding intragroup competition in the United States market. The Report explains that petitioners' restrictions on intragroup competition caused respondents to lose business that they would not have lost had petitioners competed with one another.[3]

---

[2] Dr. DePodwin summarizes his view of the harm caused by Japanese cartelization as follows:

"When we consider the injuries inflicted on United States producers, we must again look at the Japanese television manufacturers' export agreement as part of a generally collusive scheme embracing the Japanese domestic market as well. This scheme increased the supply of television receivers to the United States market while restricting supply in the Japanese market. If Japanese manufacturers had competed in both domestic and export markets, they would have sold more in the domestic market and less in the United States. A greater proportion of Japanese production capacity would have been devoted to domestic sales. Domestic prices would have been lower and export prices would have been higher. The size of the price differential between domestic and export markets would have diminished practically to the vanishing point. Consequently, competition among Japanese producers in both markets would have resulted in reducing exports to the United States and United States prices would have risen. In addition, investment by the United States industry would have increased. As it was, however, the influx of sets at depressed prices cut the rates of return on television receiver production facilities in the United States to so low a level as to make such investment uneconomic.

"We can therefore conclude that the American manufacturers of television receivers would have made larger sales at higher prices in the absence of the Japanese cartel agreements. Thus, the collusive behavior of Japanese television manufacturers resulted in a very severe injury to those American television manufacturers, particularly to National Union Electric Corporation, which produced a preponderance of television sets with screen sizes of nineteen inches and lower, especially those in the lower range of prices." 5 App. to Brief for Appellants in No. 81–2331 (CA3), pp. 1629a–1630a.

[3] The DePodwin Report has this, among other things, to say in summarizing the harm to respondents caused by the five company rule, ex-

The DePodwin Report alone creates a genuine factual issue regarding the harm to respondents caused by Japanese cartelization and by agreements restricting competition among petitioners in this country. No doubt the Court prefers its own economic theorizing to Dr. DePodwin's, but that is not a reason to deny the factfinder an opportunity to consider Dr. DePodwin's views on how petitioners' alleged collusion harmed respondents.[4]

change of production data, price coordination, and other allegedly anti-competitive practices of petitioners:

"The impact of Japanese anti-competitive practices on United States manufacturers is evident when one considers the nature of competition. When a market is fully competitive, firms pit their resources against one another in an attempt to secure the business of individual customers. However, when firms collude, they violate a basic tenet of competitive behavior, i. e., that they act independently. United States firms were confronted with Japanese competitors who collusively were seeking to destroy their established customer relationships. Each Japanese company had targeted customers which it could service with reasonable assurance that its fellow Japanese cartel members would not become involved. But just as importantly, each Japanese firm would be assured that what was already a low price level for Japanese television receivers in the United States market would not be further depressed by the actions of its Japanese associates.

"The result was a phenomenal growth in exports, particularly to the United States. Concurrently, Japanese manufacturers, and the defendants in particular, made large investments in new plant and equipment and expanded production capacity. It is obvious, therefore, that the effect of the Japanese cartel's concerted actions was to generate a larger volume of investment in the Japanese television industry than would otherwise have been the case. This added capacity both enabled and encouraged the Japanese to penetrate the United States market more deeply than they would have had they competed lawfully." *Id.*, at 1628a–1629a.

For a more complete statement of DePodwin's explanation of how the alleged cartel operated, and the harms it caused respondents, see *id.*, at 1609a–1642a. This material is summarized in a chart found *id.*, at 1633a.

[4] In holding that Parts IV and V of the Report had been improperly excluded, the Court of Appeals said:

"The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in a Japanese televi-

The Court, in discussing the unlikelihood of a predatory conspiracy, also consistently assumes that petitioners valued profit-maximization over growth.   See, *e. g.*, *ante*, at 595. In light of the evidence that petitioners sold their goods in this country at substantial losses over a long period of time, see Part III–B, *infra*, I believe that this is an assumption that should be argued to the factfinder, not decided by the Court.

## III

In reversing the Third Circuit's judgment, the Court identifies two alleged errors: "(i) [T]he 'direct evidence' on which the [Court of Appeals] relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing."   *Ante*, at 595.   The Court's position is without substance.

## A

The first claim of error is that the Third Circuit treated evidence regarding price fixing in Japan and the so-called five company rule and check prices as " 'direct evidence' of a conspiracy that injured respondents."   *Ante*, at 583 (citing *In re Japanese Electronics Products Antitrust Litigation*, 723 F. 2d 238, 304–305 (1983)).   The passage from the Third

---

sion cartel.   505 F. Supp. at 1342–46.   We have examined the excluded portions of Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous.   As a result, the court also held the opinions to be unhelpful to the factfinder.   What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the evidence pointing to collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory. Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue."   *In re Japanese Electronics Products Antitrust Litigation*, 723 F. 2d 238, 280 (1983).

The Court of Appeals had similar views about Parts VI and VII.

Circuit's opinion in which the Court locates this alleged error makes what I consider to be a quite simple and correct observation, namely, that this case is distinguishable from traditional "conscious parallelism" cases, in that there is direct evidence of concert of action among petitioners. *Ibid.* The Third Circuit did not, as the Court implies, jump unthinkingly from this observation to the conclusion that evidence regarding the five company rule could support a finding of antitrust injury to respondents.[5] The Third Circuit twice specifically noted that horizontal agreements allocating customers, though illegal, do not ordinarily injure competitors of the agreeing parties. *Id.*, at 306, 310–311. However, after reviewing evidence of cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit held that a factfinder could reasonably conclude that the five company rule was not a simple price-raising device:

> "[A] factfinder might reasonably infer that the allocation of customers in the United States, combined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market." *Id.*, at 311.

I see nothing erroneous in this reasoning.

## B

The Court's second charge of error is that the Third Circuit was not sufficiently skeptical of respondents' allegation that petitioners engaged in predatory pricing conspiracy. But

---

[5] I use the Third Circuit's analysis of the five company rule by way of example; the court did an equally careful analysis of the parts the cartel activity in Japan and the check prices could have played in an actionable conspiracy. See generally *id.*, at 303–311.

In discussing the five-company rule, I do not mean to imply any conclusion on the validity of petitioners' sovereign compulsion defense. Since the Court does not reach this issue, I see no need of my addressing it.

the Third Circuit is not required to engage in academic discussions about predation; it is required to decide whether respondents' evidence creates a genuine issue of material fact. The Third Circuit did its job, and remanding the case so that it can do the same job again is simply pointless.

The Third Circuit indicated that it considers respondents' evidence sufficient to create a genuine factual issue regarding long-term, below-cost sales by petitioners. *Ibid.* The Court tries to whittle away at this conclusion by suggesting that the "expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors . . . that suggest that such conduct is irrational." *Ante,* at 594, n. 19. But the question is not whether the Court finds respondents' experts persuasive, or prefers the District Court's analysis; it is whether, viewing the evidence in the light most favorable to respondents, a jury or other factfinder could reasonably conclude that petitioners engaged in long-term, below-cost sales. I agree with the Third Circuit that the answer to this question is "yes."

It is misleading for the Court to state that the Court of Appeals "did not disturb the District Court's analysis of the factors that substantially undermine the probative value of [evidence in the DePodwin Report respecting below-cost sales]." *Ibid.* The Third Circuit held that the exclusion of the portion of the DePodwin Report regarding below-cost pricing was erroneous because "the trial court ignored DePodwin's uncontradicted affidavit that all data relied on in his report were of the type on which experts in his field would reasonably rely." 723 F. 2d, at 282. In short, the Third Circuit found DePodwin's affidavit sufficient to create a genuine factual issue regarding the correctness of his conclusion that petitioners sold below cost over a long period of time. Having made this determination, the court saw no need—nor do I—to address the District Court's analysis point by point. The District Court's criticisms of De-

Podwin's methods are arguments that a factfinder should consider.

### IV

Because I believe that the Third Circuit was correct in holding that respondents have demonstrated the existence of genuine issues of material fact, I would affirm the judgment below and remand this case for trial.