Ruth LEMAY, et al.

v.

**LIFE INSURANCE COMPANY OF THE SOUTHWEST.**

Civ. A. No. 87–0389–A.

United States District Court,
W.D. Louisiana,
Alexandria Division.

June 16, 1988.

Gaharan & Wilson, Donald R. Wilson, Jena, La., for plaintiffs.

Provosty, Sadler & Delaunay, David P. Spence, David R. Sobel, Alexandria, La., for defendant.

## RULING

NAUMAN S. SCOTT, District Judge.

Before us are Motions for Summary Judgment filed by defendant Life Insurance Company of the Southwest and by plaintiffs Ruth Lemay, Katherine Rene Lemay Morrison and Terrance Lane Lemay.

Plaintiffs filed this action against defendant for the proceeds of an accidental death policy issued by defendant to the insured,

Samuel Alan Lemay, who died as the result of gunshot wounds. The fatal shots were fired by plaintiff Ruth Lemay, the decedent's wife and named beneficiary.

Defendant has declined to pay accidental death benefits and contends that because the insured's death resulted from his own aggressive attack, his death was not an "accident" for purposes of the policy. Plaintiffs challenge the applicability of defendant's asserted defense.[1]

■ Fed.R.Civ.P. 56(c) authorizes summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When a properly supported Motion for Summary Judgment has been made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The less plausible the plaintiff's claim, the "more persuasive" must be the evidence in the plaintiff's response. *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). Accordingly, "the question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case." *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569, 575 (1968).

■ Regardless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552. Factual disputes that are "irrelevant or unnecessary" to the outcome of the action "will not be counted." *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509, 91 L.Ed.2d at 211. Inferences arising from the facts must be "reasonable in light of the competing inferences." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d at 553. Evidence which is "merely colorable" will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed. 2d at 212. To survive the motion, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552.

■ Under Louisiana law, "if the insured was the aggressor, and by his own act precipitated the difficulty which resulted in his death, then it cannot be said that it was effected through accidental means." *Bernard v. First Nat'l Life Ins. Co.*, 248 So.2d 913 (La.App.1971) (citations omitted). *See also Dugas v. Travelers Ins.*, 785 F.2d 550 (5th Cir.1986); *Willis v. Willis*, 287 So.2d 642 (La.App.1973). Thus, when the insured is the aggressor, there can be no recovery under his accidental death policy.

■ But, if the insured is a victim, his death may be deemed "accidental" and within the meaning of an accident policy. And an aggressor can become a victim: "[U]nder certain circumstances an aggressor can lose that designation and become the victim, just as the initial victim can become the aggressor. This results whenever the original victim resorts to excessive violence and unnecessary force in repelling the assault of the original aggressor.... This is also the case when the original aggressor withdraws from the altercation and is thereafter killed by his adversary." *Willis, supra* at 646.

1. Defendant also argues the applicability of an exclusionary clause in the policy which precludes payment if the "loss shall be contributed to directly or indirectly, by: ... [a]ny commission or attempted commission or [sic] felony by the [insured]." We need not reach this argument but note that the evidence before us amply supports a finding of specific intent to commit murder.

In order to assert the insured's aggressor-status as a bar to coverage, the insurer need not rely on an explicit exclusionary clause in the policy. *Dugas, supra* at 551. However, the insurer does bear the burden of proving by a preponderance of the evidence that its insured was the aggressor. *Id. See* Federal Rule of Evidence 302.

Both parties rely in their memoranda upon the depositions of Mrs. Lemay and Terrance Lane Lemay, the couple's son who also witnessed the insured's death. Plaintiffs and defendant do not so much dispute the evidence, but rather urge upon us "conflicting ultimate facts or conclusions." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1197 (5th Cir.1986).

The depositions establish unequivocally that the insured was the aggressor in the family altercation which led to his death. Deposition of Ruth Lemay, p. 34–5; Deposition of Terrence Lane Lemay, p. 25–6.[2] However, plaintiffs insist that the testimony before us is "at best, inconclusive" in failing to prove whether the insured, although the initial aggressor, had become the victim at his death.[3]

Plaintiffs' insistence is wholly unconvincing. The testimony of the only two eyewitnesses indicates without doubt that the insured remained an aggressor, armed with a deadly weapon, as he pursued Mrs. Lemay down the hallway. Nor do we doubt that the insured contemplated a fatal ending to his pursuit. The eyewitnesses testify to no attempted withdrawal by the in-

**2.** RUTH LEMAY:

Q: Where was Alan at that point? Was he still in the living room?
A: No. He was on his way towards me when Terry started screaming.
Q: How could you tell he was on his way towards you?
A: Because he was saying that he was going to cut my Goddamn throat. He ought to have done it a hell of a long time ago.
Q: You could hear him say that as he came toward you?
A: Uh huh. I guess it will be words I'll always remember.
Q: Did you believe at that point that Alan was going to follow through with what he was telling you?
A: Yes.
Q: When you heard him coming down the hall saying those words to you or at least coming towards you saying those words to you, what was your reaction? What did you do at that point?
A: When I saw him coming down the hall then I reached—when I saw that knife in that hand, well, I knew that it was only one thing to do was to protect my own life.
Q: Right. And you were still in the hall at that point when you saw him coming with the knife?
A: When I walked back I saw him and I grabbed the gun then. I knew something had to stop him.
Deposition, p. 34–5.

TERRANCE LANE LEMAY:

Q: Did he have his knife in his hand then?
A: Yes Sir. He was saying that he was going to cut mama's dam (sic) head off and he pulled his knife out and told me if I wanted some of it, just get up or something like that.
Q: Okay. You were on the floor when he pulled his knife?

A: Yes, sir. That's when I remember seeing it.
Q: And he said he was going to cut your mother's head off and if you wanted part of it, get up and have part of it too?
A: Yes Sir. It was something to that effect.
Q: Had you ever seen your daddy that angry before?
A: No Sir.
Q: Did you get up?
A: I was fixing to get up and he was going down the hall and I heard the shots.
Q: After you saw him standing up with the knife in his hand and you were lying on the floor. Is that correct?
A: Yes Sir.
Q: Did he immediately start down the hallway toward he and your mama's bedroom?
A: It all took place real fast.
Q: Would you say that he was walking in a normal pace or walking quickly or running?
A: He was walking fairly quickly to me it looked like.
Q: Could you hear him say anything as he walked out of the living room?
A: He was still hollering at her saying he was going to cut her head.
Q: But you don't remember getting back on your feet until you heard the gun shot?
A: No Sir.
Deposition, p. 25–6.

**3.** We note the irony of plaintiff Mrs. Lemay's argument. In order to make accidental death benefits payable, she must convince us that she shot her husband not in self-defense but with unreasonable, excessive or unjustified force. If this were true, however, Mrs. Lemay could not, under Louisiana law, be a beneficiary. LSA–R. S. 22:613 D.

sured. Mrs. Lemay fired twice, but that alone did not transform the insured into a victim. *See, e.g., Thom v. Metropolitan Life Ins. Co.*, 2 So.2d 269 (La.App.1941) (son shoots father three times). Mrs. Lemay testified that she "was still scared" and in fear for her life when she shot the second time. Deposition, p. 38. Plaintiffs cannot avoid summary judgment by raising uncertainties which the testimony belies. Plaintiffs cannot recover accidental death benefits in this matter.

Summary judgment for plaintiffs is DENIED. Summary judgment for defendant is GRANTED. An appropriate Judgment will issue.

DONE AND SIGNED at Alexandria, Louisiana, this 16th day of June, 1988.