Leland STUMP and Carol Sue
Stump, Plaintiffs,

v.

CRAWFORD & COMPANY and
Commercial Union, Defendants.

Civ. No. F 88–241.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Nov. 28, 1989.

Linda M. Wagoner, Myers & Wagoner,
Fort Wayne, Ind., for plaintiffs.

Edward N. Kalamaros, Timothy J.
Walsh, Edward N. Kalamaros & Assoc.,
South Bend, Ind., for Crawford & Co.

John D. Walda, Barrett & McNagny,
Fort Wayne, Ind., for Commercial Union.

ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendants' motion for summary judgment and motion to strike portions of plaintiffs' submitted affidavits. Oral arguments were heard on September 11, 1989. For the following reasons, defendants' motion for summary judgment will be denied and defendants' motion to strike will be denied in part and deemed to be moot in part.

*Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512; *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex*, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512.

### Background Facts

The facts, construed in the light most favorable to plaintiffs, are as follows. The plaintiff, Leland Stump (Lee) is a resident of the state of Indiana and was an employee of Hitzfield Excavating Company (Hitzfield). The plaintiff, Sue Carol Stump (Sue), Lee's wife, is also a resident of the state of Indiana and was an employee of Target Stores. Sue is legally blind and cannot drive. The defendant, Commercial Union (Commercial) is a corporation incorporated under the laws of the state of Delaware with its principal place of business in Delaware. Defendant, Crawford & Company (Crawford), is a corporation organized under the laws of the state of Georgia with its principal place of business in Georgia.

On August 13, 1986, Lee was injured in an industrial accident which resulted in the amputation of both of his legs. At the time of Lee's accident, Hitzfield was insured under a policy of workmen's compensation insurance issued by Commercial. After Lee filed a workmen's compensation claim, Commercial hired Crawford to coordinate any medical services and benefits due and owing Lee under Hitzfield's policy. Crawford's employees made monthly status reports to Commercial regarding Lee's progress. Lee's amputation and subse-

quent treatment were primarily conducted by Dr. Ronald G. Caldwell.

Lee was released from the hospital on August 27, 1986, after being assured by one of Crawford's representatives, Peggy Hippenhammer, that he would receive medical care, out-patient therapy and occupational therapy, medical supplies, transportation, ramps, grab bars, and home health care provided by Sue. Russell Miller, a representative of Commercial, also had made arrangements for a hospital bed, a hoyer lift, and other necessary equipment to be in Lee's home upon his release from the hospital. Lee was also told before he left the hospital that he needed special care, exercise and therapy to avoid a condition called "flexion constricture." Stump shrinkers were supposed to be kept on his legs to aid in avoiding this condition.

Upon Lee's release from the hospital, he and Sue accepted payment for domestic nursing care for eight hours a day of services at a rate of $6.00 per hour. Sue quit her job at Target to provide the full-time home health care that Lee needed. However, due to Sue's blindness and the fact that she is not a nurse, she could not perform all of the medically necessary procedures. She could not keep the stump shrinkers on Lee as required and she had to be with him 24 hours a day for his protection because Lee had not been taught how to balance or move prior to his hospital release. Lee requested additional nursing services and special Jobst shrinkers which were ordered by Dr. Caldwell. Hippenhammer told Lee that no additional nursing services would be provided and refused to approve purchase of the Jobst stump shrinkers.

Despite the promise of continued therapy on an out-patient basis, and the medical necessity of such therapy, Lee's therapy was stopped for two months after his release from the hospital. The therapy was stopped due to the fact that Lee had no means of transportation from his home to the hospital. Lee contends that before he left the hospital, he was promised a van for transportation purposes. After he went home, Hippenhammer and Russell Miller told him that he misunderstood and would be furnished transportation by "taxi van" to and from medical appointments only. Lee explained the need for accessible transportation to conduct everyday affairs, including going to therapy, since Sue could not drive. Lee was told that he would be provided once a week grocery shopping but he was on his own to resolve any other transportation problems he had. Only after Lee's repeated efforts and complaints did Crawford consent to transport him to the therapeutic appointments which were ordered by Dr. Caldwell and required by the prosthetist.

Lee stated in his affidavit[1] that he was also told that wheelchair ramps wold be provided and that his bathroom would be altered to accommodate his daily needs, including installation of grab bars for ease of transfer. Defendants moved to strike these statements on the basis that they would be inadmissible hearsay evidence. Defendants apparently misconceive the purpose for which these statements were made. Lee's affidavit was submitted in opposition to the summary judgment motion which claimed that Lee could not prove fraud because no false representations were made to him upon which he could justifiably rely. The statements in the affidavit were not made for the purpose of proving the matters asserted therein. They were made to show the reliance element which defendants contend is missing. Therefore, defendants' motion to strike these statements is denied.

Furthermore, Lee's affidavit statements do not create a material issue of fact in dispute. Plaintiff's affidavit merely expounds on the specifics of what happened. Defendants' own recitation of the facts

---

1. Defendants have filed a motion to strike several portions of Lee's affidavit as consisting of inadmissible hearsay, mere conclusions or not made on personal knowledge. Several of the statements of which defendants complain are completely irrelevant to the issues presented in the summary judgment motion and are deemed moot. Defendants' objections to any affidavit statements relied on by this court will be addressed on an individual basis as they are presented in this order.

concede that Lee was promised "ramps" and "grab bars" after leaving the hospital. Defendants further concede that Lee "experienced some delay in receiving some of these items or reimbursement of his expenses for providing them himself." Defendants have not submitted any affidavits to contradict plaintiffs' statements. In addition, defendants' reply brief fails to rebut or object to any of the more specific factual allegations made by the plaintiffs. Since this matter is before the court on defendants' motion for summary judgment, this court must accept the facts most favorable to the plaintiffs. The facts most favorable to the plaintiffs are those which detail the extent of the promises made and the results of the delay in their performance.

Defendants had not made any provisions for ramps of the steps which lead into Lee's home by the time of his release from the hospital. Every entrance to Lee's house involved at least one step which he had not been trained to maneuver by wheelchair before he came home. Since Lee weighed approximately 280 pounds, Sue could not lift him and the wheelchair up and over these steps. Lee called a company on his own initiative to have ramps installed. He was chastised by Hippenhammer for ordering the installation without prior approval. By November or early December 1986, Lee's bathroom still had not been altered to accommodate his wheelchair. During this three month period, Lee relied on "butt-walking" to get in and out of his bathroom to maintain his personal hygiene. He again contracted to finally have the promised work done on his own initiative. Despite defendants' promises, Hippenhammer stated in a report issued to Commercial an entire month after Lee's release from the hospital and after problems associated with being at home became obvious, that it was "too early" to make the promised modifications.

In June 1987, defendants received a letter they solicited from Dr. Caldwell in which he answered the question, "what is the permanent partial impairment sustained by Mr. Stump?", as follows:

Question # 8: Permanent Partial Impairment: As defined in the "Evaluation of Permanent Impairment" by the AMA, amputation above the knee joint with functional stump gives the percentage impairment of the lower extremity of 90% or 36% of the whole person. Below knee amputation with functional stump has a 70% impairment of the lower extremity with a 28% of the whole person. Using the Combined Values chart, this would work out to be 54% permanent partial impairment of the entire person.

Although Dr. Caldwell's answer concerning Lee's permanent partial impairment clearly refers only to an AMA definition for the type of injuries suffered by Lee, Commercial construed Dr. Caldwell's response as his professional evaluation that Lee had reached a "permanent and quiescent" state. To be "permanent and quiescent" means that a permanent impairment has been medically determined and that the person is not going to get any worse or any better.

At the time that defendants received Dr. Caldwell's letter, they were aware that Lee was suffering from a rash and ulcers on his stumps caused by an allergic reaction to his temporary prostheses. Defendants also knew that Lee had only recently begun fittings for his permanent prostheses and that he was having difficulty with that process due to the condition of his stumps. Furthermore, Theodore Nonte, claims manager for Commercial, changed the rating in Dr. Caldwell's letter to 100% for purposes of computing a settlement offer to Lee, stating that the AMA guidelines were an insufficient basis for Dr. Caldwell's rating. Nonetheless, based solely on Dr. Caldwell's June 15, 1987 letter, Commercial terminated Lee's temporary total disability benefits in June 1987. Commercial also terminated Lee's physical therapy and home health care benefits despite the response in Dr. Caldwell's June 15, 1987 letter, which stated:

... [Lee] is unable to stand, use his hands and provide for himself at home in terms of food. He will need this type (home health care) to survive at home for an indefinite period of time, at lest for a few more months ... until he can bal-

ance and walk without such extensive aid as he needs at this point. . . . he will continue to need . . . therapy again over the next 3–6 months to increase his independence with his new prostheses and increase his activities of daily living . . .

Lee learned that his benefits had been discontinued when he called Commercial in early July to report that he and Sue had not received their June checks.

Eight weeks later, after failing in their attempt to settle Lee's claim for a lump sum permanent partial impairment amount, Commercial reversed its decision to terminate Lee's temporary total disability benefits. Commercial made the reversal decision because it received a correcting letter from Dr. Caldwell, and after Lee had filed a Form 14 complaint with the Industrial Board and hired an attorney, Lee received repayment of the weekly benefit amount he had not received during the eight weeks. However, Commercial did not reinstate payments for physical therapy or home health care being provided by Sue.

The physical therapy benefits were voluntarily reinstated by Commercial beginning in March 1988, more than eight months after termination of the benefit. Commercial does not give a reason for its failure to reinstate physical therapy benefits when it reinstated Lee's temporary total disability status. The delay in receiving therapy caused Lee to suffer physical damage in the form of stricturing which resulted in his inability to be fitted for permanent prostheses.

Commercial states that it based its decision to not reinstate home health care benefits to Lee on an occupational therapy investigation report written in October 1986. Commercial did not consider Dr. Caldwell's statement regarding Lee's inability to cope with daily living activities in the June 15, 1987 letter. The October 1986 report relied on by Commercial was obtained by the defendants under irregular circumstances since Lee had not signed a medical records release form. No one knows who authored the report, but it was not written by anyone with first hand knowledge of Lee's abilities to exist independently in his home

at that time. Hippenhammer's status reports issued around that same time period raise doubt as to the accuracy of the occupational therapy report. Hippenhammer reported on limited capabilities of Lee in his home and requested that an occupational therapy visit to his home be made. Meg Wilson, a Crawford representative who replaced Hippenhammer, also recommended occupational therapy evaluations in all four status reports she prepared. Plaintiffs contend that the facts show that Commercial could not, and did not, rely on the October 1986 occupational therapy report to make its determination to terminate home health care benefits. In addition to ignoring the reports of Dr. Caldwell, Hippenhammer and Wilson, Commercial continued home health care benefits until June 1987, despite issuance of the erroneous occupational therapy report eight months earlier.

On August 6, 1987, Meg Wilson wrote a letter to Russell Miller, a Commercial representative, stating that Lee could perform all the functions of daily living and was totally independent in all activities. She wrote the letter in accordance with instructions given to her by Miller, although the statements she made were contrary to her prior observations and were inaccurate and incomplete.

Although Wilson's letter was written after the decision to terminate benefits had been made, Commercial maintained that it relied on that letter to terminate and not reinstate Lee's home health care benefit. Commercial presented Wilson's letter as evidence supporting its decision at a hearing held by the Industrial Board in January 1988. Upon plaintiffs' challenge to the accuracy of Wilson's letter, the Industrial Board refused to allow the letter into evidence. The Industrial Board further ordered defendants to produce the four status reports written by Wilson prior to August 6, 1987; however, defendants only produced one of these reports. The Board addressed the issues of repayment for a van Lee purchased for transportation and payments for home health care. The Board did not address the issue of physical

therapy benefits since defendants agreed to provide therapy payments prior to the hearing.

After the January 1988 Board hearing, defendants continued to ignore requests from Lee's prosthetist that physical therapy was necessary to enable Lee to be fitted with permanent prostheses. Finally, in March 1988, after repeated letters and telephone calls from Lee's doctors, therapy was resumed. Drawing all reasonable inferences in the plaintiff's favor, this court must infer that by the foregoing conduct, defendants acted in bad faith.

On August 15, 1988, plaintiffs filed this lawsuit alleging that defendants wrongfully, falsely and fraudulently terminated Lee's workmen's compensation benefits. Lee alleges that the defendants acted in concert in a malicious and intentionally fraudulent manner to cause substantial delay in treatment and payment of funds which resulted in mental anguish and irreparable damage to Lee. Sue alleges that as a result of defendants' actions, she was forced to abandon her employment at Target Stores, lose compensation for home health care she gives to Lee and suffer mental anguish.

Defendants filed a joint motion for summary judgment. Defendants contend that plaintiffs' claims do not constitute a cause of action maintainable in Indiana due to the exclusiveness of the Workmen's Compensation Act. Defendants contend that the only action for bad faith against an insurer which may be pursued outside of the exclusive workmen's compensation remedies is one for fraud. Defendants further contend that plaintiffs cannot prove fraud because they personally did not justifiably rely on any of defendants' statements to their detriment. Defendants' contentions are a misstatement of Indiana law and the alleged facts in this case.

## I. Indiana Workmen's Compensation Act and Bad Faith

 The Indiana Workmen's Compensation Act contains the following exclusive remedy provision:

Sec. 6. The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representatives, dependents or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 16–7–3.6.

I.C. 22–3–2–6. This exclusive remedy provision also applies to actions against an employer's workmen's compensation insurance carrier. *McCutchen v. Liberty Mut. Ins. Co.*, 699 F.Supp. 701 (N.D.Ind.1988); *Jones v. National Union Fire Ins. Co.*, 664 F.Supp. 440 (N.D.Ind.1987); *Baker v. American States Ins. Co.*, 428 N.E.2d 1342 (Ind.App.1981). It is also clear that the exclusive remedy provision only applies to claims "for personal injury or death by accident arising out of and in the course of the employment." I.C. 22–3–2–2; *Baker*, 428 N.E.2d at 1346.

In *Baker*, an employee sought compensatory and punitive damages against his employer's workmen's compensation insurance carrier for harm allegedly suffered as a result of knowing misrepresentations made by the insurer's adjusters in an attempt to settle the employee's claim for less than the amount to which he was entitled. The court stated that:

... IC 22–3–2–6 speaks to personal injury or death by accident on the job, but it does not purport to prohibit actions by an employee against his employer's workmen's compensation insurance carrier for fraudulent misrepresentations made while the employee and the insurer are attempting to settle the claim ... the alleged fraudulent misrepresentation ... is not the kind of harm for which the Workmen's Compensation Act was calculated to compensate.... The alleged fraudulent misrepresentation did not arise "out of and in the course of the employment" ... it arose after Baker had been temporarily but totally disabled from working for a period of time ... If Baker's allegations regarding the behavior of the adjusters for American States prove to be true, then it is in the public

interest of this state to discourage such activities and to compensate the victim for resulting injury.

428 N.E.2d at 1347. The court went on to specifically hold that:

> ... the Workmen's Compensation Act does not preclude Baker's suit for damages, except to the extent that he claims attorney's fees as an element of his damages.

*Id.*

■ The *Baker* analysis clearly applies to the alleged misconduct of the defendants in adjusting plaintiff's workmen's compensation claim now before this court. Plaintiff has made specific allegations of fraudulent misrepresentations, as well as other bad acts, designed to limit plaintiff's compensation to an amount less than that to which he was statutorily entitled. Plaintiff has also alleged emotional distress accompanied by additional physical injuries caused by defendants' misconduct. Neither the fraudulent misrepresentations, nor the emotional distress, nor the additional physical injuries arose "out of and in the course of employment", but rather, occurred after Lee had been temporarily but totally disabled from working for a period of time. Nor could Lee have presented these claims to the Industrial Board as compensable under the Workmen's Compensation Act. As the *Baker* court appropriately stated, "it is in the public interest of this state to discourage such activities and to compensate the victim for resulting injury." It is abundantly clear to this court that plaintiff's claim is not precluded by the exclusive remedy contained in the Workmen's Compensation Act.

After having determined that Baker's suit against the insurer for bad faith in adjusting the claim was not precluded by the Workmen's Compensation Act, the *Baker* court had to determine whether Baker's allegations of fraudulent misrepresentation stated a cause of action under Indiana law sufficient to warrant recovery of damages for emotional distress. The only alleged injuries suffered by Baker as a result of the insurer's bad faith were "great concern, distress and mental anguish." Although Baker clearly could maintain an action for intentional fraud against the insurers, the general rule in Indiana regarding recovery of damages for mental anguish requires an accompanying, or resulting, physical injury. *Id.* at 1349; *Indiana Motorcycle Ass'n v. Hudson*, 399 N.E.2d 775, 779 (Ind.App.1980). Since Baker alleged no physical injury, the court proceeded to determine whether he could maintain his action pursuant to an exception to the impact rule which requires the showing of an invasion of a legal right. The court ultimately held that the tort of fraud, if proven, would constitute an invasion of a legal right, and therefore, Baker could maintain his fraud claim for recovery of emotional distress damages. *Id.* at 1349.

Defendants erroneously argue that this discussion in *Baker* makes it clear that the only "bad faith" which is actionable outside of the Act is an allegation of fraud. This is clearly *not* what *Baker* held, nor do the subsequent cases which cite *Baker* support defendants' interpretation.

Defendants' reliance on *Vantine v. Elkhart Brass Mfg. Co., Inc.*, 762 F.2d 511 (7th Cir.1985), is totally misplaced. In *Vantine*, the court was faced with the issue of whether a claim which merely alleged bad faith and sought damages for emotional distress with no accompanying physical injury was maintainable against a workmen's compensation insurer. The court held that the Vantines' claim failed "to establish either a fraudulent misrepresentation or a host tort supporting a claim for emotional distress." *Id.* at 522. It is clear that a "host tort" refers to a legal action maintainable in Indiana for the recovery of damages for mental anguish in the absence of accompanying or resultant physical injury. *Id.* at 521; *Baker*, 428 N.E.2d at 1348–50. Clearly, the facts before this court do not necessitate finding a "host tort." The plaintiffs have alleged physical injury as a result of defendants' actions and no more is needed for them to bring a claim for emotional distress. Furthermore, unlike the Vantines, plaintiffs have also specifically alleged fraudulent misrepresentations.

*Jones v. National Union Fire Ins. Co.*, 664 F.Supp. 440 (N.D.Ind.1987), also contradicts defendants' contention. In *Jones*, the court specifically rejected defendants' argument that *Vantine* limited *Baker* to fraud claims only, stating, *"Baker* is not limited to fraud claims." *Id.* at 446. However, the *Jones* court did go on to find that Jones' allegations of bad faith against the insurer were insufficient to state a claim absent "facts that would constitute an independent tort in Indiana." *Id.* at 448. While recognizing that allegations of bad faith may warrant additional or punitive damages, the court held that, standing alone, bad faith is no ground for recovery of damages under Indiana law. *Id.* The facts before this court show that plaintiffs' allegations of bad faith are not standing alone. Plaintiffs have clearly alleged sufficient facts to maintain an independent action for physical injury and an independent action for emotional distress in Indiana. Those actions are not precluded by the exclusive remedy provisions of the Workmen's Compensation Act.

## II. Fraud

Defendants also contend that plaintiffs cannot maintain their action for fraud because the facts fail to establish the essential element of reliance which is required for plaintiffs to prevail. The elements of fraud, as set forth in *Baker*, are as follows:

> It is firmly established in Indiana that the essential elements of actual fraud are a material representation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, which causes a reliance to the detriment of the person relying upon it.

*Baker*, 428 N.E.2d at 1348. Although reliance is a required element, "whether the plaintiff relied upon a misrepresentation is a question for the trier of fact." *Id.*

The burden in this motion for summary judgment is on the defendants to

show that there is no "evidence on which a jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Construing the facts most favorably for the plaintiffs, as this court must, it is abundantly clear that a jury could find that the plaintiffs relied upon misrepresentations made by the defendants. At a minimum, a reasonable jury could infer that the plaintiff would not have left the hospital only two weeks after losing both of his legs unless he felt certain that his level of hospital care and benefits were going to continue at home.[2] A reasonable jury could also infer that Lee justifiably relied upon the promises that such a level of care and benefits would be equally available to him at home.

### Conclusion

Accordingly, based on the foregoing, defendants' motion for summary judgment is hereby DENIED. Defendants' motion to strike is hereby DENIED as to the portions of Lee Stump's affidavit referred to in this order. Judgment on defendants' remaining motion to strike is hereby deemed MOOT.

---

2. At oral arguments, defendants introduced the additional contention that any of the promises made to Lee which may have induced him to leave the hospital were promises of future performance and are not actionable as fraud. It is obvious to this court that whether the promises were for future performance or representations of present fact as to what had been done in preparation for Lee's arrival home is an issue of fact which the jury must determine.