**B.C.F. OIL REFINING, INC., Plaintiff,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., et al., Defendants.**

**No. 94 Civ. 8565 (CBM).**

United States District Court, S.D. New York.

Feb. 14, 1997.

Michael J. Grudberg, Stillman & Friedman, P.C., New York City, for B.C.F. Oil Refining, Inc.

William H. Roth, Kelly & Roth, New York City, for Clean Venture, Inc.

Robert F. Roarke, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Miller Environmental Group, Inc.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiff BCF Oil Refining, Inc., formerly an oil refining company, brings this action against defendant Consolidated Edison Company of New York, Inc., ("Con Edison") alleging that Con Edison distributed contaminated oil to plaintiff. Plaintiff has also brought claims against defendants Miller Environmental Group, Inc. and ABC Tank Repair & Lining, Inc. (collectively, the transporter defendants) for allegedly transporting such contaminated oil from Con Edison and delivering it to plaintiff.

Con Edison has filed a motion for summary judgment, and the transporter defendants have filed derivative motions for summary judgment in the event that the court grants Con Edison's motion. For the reasons explored *infra*, Con Edison's motion is granted in part and denied in part. Furthermore, ABC's motion for summary judgment is granted and the motion of Miller Environmental Group is denied.

## I. BACKGROUND

### A. Plaintiff's Operating Procedure

Plaintiff owned a facility for the receipt and disposal of liquid wastes. Plaintiff's primary business objective was to extract the waste oil portion of any delivery and, after reprocessing, sell it as heating oil.

Liquid waste was brought to plaintiff's facility by independent transporters who collected the liquid waste from numerous sources. When a transporter's truck arrived, plaintiff first determined how much water was contained in the liquid waste by drawing a sample of the waste and placing it in a centrifuge, where the oil and the water would separate. If the waste oil had a concentration less than 5% by volume, it was considered waste water. Since plaintiff derived little economic benefit from waste water (given the low concentration of oil), plaintiff would charge waste water originators a fee in order to dispose of the liquid waste, which would then be off-loaded to one of plaintiff's "water tanks." If the concentration of waste oil was greater than 5%, plaintiff would pay the liquid waste originator, since this was the material plaintiff used to manufacture reprocessed heating oil. In such cases, when the waste water and waste oil were already separated into relatively distinct strata within the truck, the waste water would be placed in one of plaintiff's "water tanks" and the waste oil would be placed in an "oil tank." However, if the waste water and waste oil had been mixed due to vibrations in transit (much like oil and vinegar salad dressing are mixed when shaken), the contents were emptied either into a water tank or an oil tank depending on the relative concentrations of waste oil and waste water. The reprocessing of the oil began after the liquid waste had been deposited into the appropriate tank(s).

Because plaintiff did not operate as a facility permitted to receive hazardous waste, applicable state and federal regulations prohibited plaintiff from accepting oil which contained polychlorinated biphenyls ("PCBs") in concentrations greater than 50 parts per million (ppm)[1].

In order to insure that plaintiff did not accept oil whose concentration of PCBs exceeded 50 ppm, the EPA required plaintiff to undertake a variety of testing procedures. First, plaintiff was required to test all liquid waste that was not waste water which arrived at its facility using what is known as the Dexsil PCB test kit. Waste water was not tested because PCBs are insoluble in water and cannot therefore be found in aque-

---

1. PCBs are chemical compounds that had been widely used in the 1960s and early 1970s because of their fire resistant properties. The passage of the Toxic Substance Control Act in 1983, however, compelled users of PCBs to begin a long-term process of trying to eliminate these hazardous substances from their systems. Nevertheless, PCBs remain prevalent in older equipment. Most relevant to these proceedings, they are found in older transformers and capacitors, both of which are used by Con Edison at its power plants.

ous solutions at concentrations even near 50 ppm.

In addition to the Dexsil test, samples from 5% of incoming oil loads were sent to an independent certified laboratory, which examined the materials using a much more accurate technique known as gas chromatography ("GC"). Finally, the EPA required plaintiff to send a sample of its finished oil product each week to the same independent laboratory for GC testing.

## B. Contamination

On April 8, 1994, a sample from plaintiff's finished oil product was sent to an independent laboratory for testing. Although the prior sample, taken on April 1, had tested within acceptable parameters for PCBs, the April 8 sample reflected PCB levels well in excess of 2,000 ppm. Shocked by this highly unusual result, plaintiff ordered another test, which yielded the same result. When plaintiff's president was informed about this in mid-May, 1994, he had no choice but to cease all sales of oil and disclose all that he knew to the EPA. Plaintiff filed this suit shortly thereafter, alleging that Con Edison had violated the Toxic Substance Control Act by causing oil with high concentrations of PCBs to be delivered to plaintiff on 25 separate occasions between March 29 and May 18, 1994. Plaintiff also alleged that Con Edison was liable for negligence and breach of warranty. Finally, suit was brought against the transporter defendants for negligence, breach of warranty, and fraud.

## II. ANALYSIS

■ "Uncertainty as to the true state of any material fact defeats [a summary judgment] motion." *Gibson v. American Broadcasting Companies*, 892 F.2d 1128, 1132 (2d Cir.1989). It is not the role of the trial court to weigh the evidence presented or to resolve any factual issue, but rather it is the court's job to determine whether, after the parties have conducted adequate discovery, any such issues remain to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); Fed. R.Civ.P. 56(c). A factual issue is unresolved if a reasonable factfinder could determine in favor of either party. *Anderson*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Gibson*, 892 F.2d at 1132. Moreover, [t]he court must view the inferences to be drawn from the facts in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). The nonmoving party may defeat the motion for summary judgment by producing sufficient facts to establish a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Con Edison argues that none of the 25 shipments which it sent plaintiff between March 29, 1994 and May 18, 1994 could have caused the PCB contamination. The court agrees with Con Edison on 24 of the 25 shipments but holds that there is a genuine issue of material fact as to one of the shipments, namely the one made on April 6, 1994.

## A. Liquid Waste Sent Between April 8, 1994 and May 18, 1994 (22 Shipments)

■ It is undisputed that the sample which was taken which yielded an abnormally high PCB concentration was taken at 9:30 a.m. on April 8, 1994. Therefore, liquid waste sent by Con Edison after the April 8 sample was taken clearly could not have caused the contamination. Indeed, plaintiff's president seems to admit this in the following passage of his deposition:

Q: Is there any doubt in your mind that by April 8, 1994, the PCB contamination had already occurred at BCF?

A: When I was informed of this particular situation, you're right. Yes. The contamination was there. Now I know this. On April 8, this is a factual thing.

Deposition of Salvatore Cortese, President of BCF Oil Refining, Inc., pp. 487–88 (Dec. 20, 1995).

While it is possible that further contamination could have occurred after that date, there is simply no evidence which indicates

as much. In fact, another sample taken on May 13, 1994 indicated a PCB concentration of 163 ppm, still quite high, but significantly reduced from the over 2000 ppm concentration found in early April. This tends to show that the oil subsequently sent to plaintiff was PCB-free and, when mixed with the oil with very high concentrations of PCBs, lowered the total PCB concentration substantially.

Plaintiff does not offer any evidence to contradict this and does not even argue in its lengthy memorandum opposing summary judgment that the post-testing shipments could have been laden with PCBs. Accordingly, summary judgment is granted as to these 22 shipments.

### B. The March 29 and April 5 Shipments

■ There is no genuine issue of material fact regarding two of the three pre-April 8 shipments sent by Con Edison to plaintiff. This is because the "unloading tickets" for these shipments, prepared by plaintiff whenever a truck seeks to off-load liquid waste at plaintiff's facility, clearly indicate that the waste contained in the shipments was waste water. Since waste water, according to the submissions of both parties, cannot contain a PCB concentration even approaching 50 ppm, it seems inconceivable that this waste water could have caused the PCB contamination at issue. Plaintiff does not offer any evidence contradicting its own documents, and does not provide any explanation as to how the shipments which its own documents reveal were waste water could have been PCB contaminated waste oil. Consequently, the court grants summary judgment as to these shipments as well.

### C. The April 6 Shipment

■ There remains one final shipment, namely the one which was made on April 6, 1994. Con Edison argues that this shipment could not be the source of the PCB contamination either. Con Edison points to the fact that the unloading ticket of this shipment also indicates that it consists of waste water. Con Edison further argues that the liquid

waste for this particular shipment came from water which had collected around an excavation of a fuel oil line and from a moat which surrounded fuel oil tanks. Thus, even if a significant portion of the liquid waste was waste oil, it could not be the source of the contamination because fuel oil does not contain PCBs and because plaintiff's own expert claims that the source of the contamination was transformer oil and not fuel oil. Finally, Con Edison points to the fact that over 50,000 gallons of waste oil were shipped to plaintiff between April 1, 1994, when GC testing indicated that there were no PCBs in plaintiff's tank, and April 8, 1994, when the test revealed the unusually high concentration PCBs. Con Edison makes much of the fact that plaintiff does not even know the sources of this waste oil, since it does not keep records of this sort.[2] Since Con Edison's waste was clearly waste water, and since any oil in the waste came from PCB-free fuel oil, Con Edison argues that the only conclusion that a reasonable factfinder can draw from this evidence is that the source of the PCB contamination comes from the thousands of gallons of waste oil of unknown origins.

However, plaintiff has proffered enough contradictory evidence to create a genuine issue of material fact. First of all, plaintiff's unloading ticket is not as unambiguous as Con Edison indicates. While it is true that in the section designated "Chemist's Report", the word "water" is checked, the word "oil" was also checked at first, though it was later crossed out. Similarly, on the line designated "Contents," the words "waste water" and "# 6 oil bottoms" were originally written, but the latter was crossed out. Moreover, on the reverse side of the ticket, the words "estimated about 500–1000 gals" are written and then crossed off again. Since the ticket also indicated that the gross number of gallons of waste in the shipment was 5400, clearly the writing on the back was not intended to approximate the total volume of liquid waste. A reasonable juror could therefore find that

---

**2.** In fact, the only reason that plaintiff knows of Con Edison's shipments are because Con Edison

keeps such records in the course of its business.

the "500–1000 gal." refers to the amount of waste oil in the shipment.

In addition to plaintiff's unloading ticket, the manifests of Miller Environmental Group, the company which transported the April 6 shipment, indicate that the material shipped was a "waste combustible liquid." Both plaintiff's expert as well as common sense dictate that, since water is not combustible, the waste must have included some oil as well. Con Edison strenuously argues that the term "waste combustible liquid" refers to any liquid which has even trace amounts of oil in it. Needless to say, this is not a matter that can properly be decided on summary judgment.

Furthermore, plaintiffs have proffered enough evidence to make the question of whether the waste oil allegedly contained in the April 6 shipment was contaminated with PCBs. First of all, the Miller Environmental Group manifest indicates that the source of the waste was the Astoria power station, which, by Con Edison's own admissions, was a central receiving point for PCB-contaminated material from Con Edison's other facilities. Con Edison's evidence that the waste in the shipment came from water at the Astoria power station that surrounded fuel oil tanks and a fuel oil line come solely from affidavits of Con Edison employees. This is simply not enough to serve as the basis for the grant of summary judgment. Finally, the type of PCBs found in the contaminated sample were the same as the type of PCBs used by Con Edison in its older equipment, and other chemical compounds found in the contaminated sample were used by Con Edison to cool its transformers.

**D. Transporter Defendant's Motions**

■ Neither of the transporter defendants has made a motion for summary judgment on the merits at this time. However, both have filed derivative motions for summary judgment seeking dismissal of the action against them in the event that summary judgment was decided in favor of Con Edison. Since one of the transporter defendants, ABC Tank Repair & Lining, Inc., was not involved in the April 6 shipment, and since summary judgment has been granted as to all of the other shipments, summary judgment will be granted as to it. However, Miller Environmental Group's motion will be denied as to the April 6 shipment since it was the transporter defendant which made that shipment.

## III. CONCLUSION

For the reasons set forth above, Con Edison's motion for summary judgment is granted as to 24 of the 25 shipments it made between March 29 and May 18, 1994, but denied as to the shipment made on April 6, 1994. Furthermore, defendant ABC's motion for summary judgment is granted and defendant Miller Environmental Group's motion is denied as to the April 6 shipment.