Steven BELLEVILLE,
et al., Plaintiffs,

v.

**ROCKFORD MANUFACTURING GROUP, INC., Defendant.**

No. 00–72457.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 19, 2001.

---

**914**

Alexander H. Benson, Mindell, Panzer, Southfield, MI, for plaintiffs.

Thomas F. Myers, Garan, Lucow, Detroit, MI, for defendant.

## OPINION & ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT

EDMUNDS, District Judge.

This matter came before the Court on Defendant's motion for summary judgment and Plaintiff's motion to amend complaint. For the reasons set forth below, Defendant's motion for summary judgment is DENIED and Plaintiff's motion to amend complaint is GRANTED.

### I. Facts

This case arises out of the death of Christopher Tobin ("Plaintiff"), who was fatally injured while operating a wire draw machine at work.[1] Plaintiff's employer, Shamrock Fasteners, is a machine shop that produces, among other things, metal bolts. As part of the manufacturing process of the bolts, wire draw machines are used to size wire. To accomplish this, the wire draw machine pulls a wire though a specific size bushing (a metal lined round hole). After passing through the wire draw machine, the wire next travels to a cold heading machine, which is the machine that actually transforms the sized wire into screws, bolts, or fasteners.

Rockford Manufacturing Group, Inc. ("Defendant") built the machine that Plaintiff was operating at the time of his death. This particular model of machine involved in this case is known as an RMG 89.[2] The

---

1. This machine is also properly referred to as an 'autodraw' machine.

2. A photograph of the machine that Plaintiff was operating at the time of his death is attached as Plaintiff's Exhibit 3.

machine in question was manufactured in 1994, and delivered to Shamrock Fasteners shortly thereafter. Plaintiff was fatally injured during the wire draw machine set-up operation.

It is quite clear that Plaintiff was not setting up the wire draw machine as recommended by the manufacturer at the time of his death. Therefore, the crux of this motion is not whether Plaintiff was misusing the machine, but whether Plaintiff's misuse was reasonable and foreseeable to the Defendant.

To properly set-up a wire draw machine, wire is fed into the machine through the use of two jog buttons, one for forward and one for reverse. The wire is wrapped around a capstan (a large wheel located on the side of the machine), pulled through the bushing, and then fed out the other side. The cold heading machine, which is located "downstream" from the wire draw machine, occasionally speeds up or slows down production depending on its performance.[3] If slack appears in the wire as it travels from one machine to another, then the wire draw machine automatically slows itself down. If the wire becomes too taught, then the wire draw machine automatically speeds itself up. This is accomplished through the use of a "compensating arm". The compensating arm is the speed regulation device on the wire draw machine, and should play no role in the set-up of the machine.

Employees of Shamrock Fasteners, including the Plaintiff, improperly used the compensating arm as a joy stick to rotate the capstan in order to load wire onto the machine. Apparently this was a quicker way to set-up the machine than using the jog buttons. In order to accomplish this, the regulating air pressure of the compensating arm was turned off (the manufacturer advised that the air pressure of compensating arm should never be turned off during operation), and the capstan guard was raised up to allow wire to be fed into the machine. On November 12, 1999, at approximately 1:15 p.m., Plaintiff was attempting to load wire into the wire draw machine by turning off the air supply to the compensating arm and attaching the wire to the hub of the capstan. During the course of loading the wire, Plaintiff's left hand became caught in the wire, pulling him into the turning capstan hub, which resulted in his head being crushed between the capstan hub and the wire relaxer wheel.

Plaintiff argues that Defendant should have installed a "capstan guard interlock" on this wire draw machine. If such an interlock was installed, then the only way to turn the capstan, when the capstan guard was raised, would have been to use the jog buttons. Defendant manufactures a capstan guard interlock, and it is safe to assume that had one been installed on this machine, Plaintiff's death would have been avoided. This interlock is required by a variety of state and federal safety standards, and Defendant includes such a safety device on all European delivery machines in order to comply with European safety standards. *See* Affidavit of Vaughn Adams attached as Plaintiffs Exhibit 9. Both parties agree that the capstan guard interlock would have only cost "a few hundred dollars" to install on the $35,000.00 wire draw machine. *See* Deposition of Timothy Taylor, Defendant's President, attached as Plaintiff's Exhibit 1, page 35.

Defendant claims that the responsibility of ordering a capstan guard interlock falls on the purchaser of the machine, and that they offer the interlock system as an option. However, Plaintiff counters this argument by stating that Shamrock Industries was never informed that a capstan

---

**3.** Downstream simply refers to the machines    relative location on the assembly line.

guard interlock system was available. Testimony from Defendant's Michigan sales representative indicates that even he was unaware that such a system could be installed on this wire draw machine. *See* Deposition of James Westfall, attached as Plaintiff's Exhibit 4, page 33.

Plaintiff claims that Mr. Tobin's misuse of the wire draw machine must have been reasonably foreseeable to the manufacturer. Several Shamrock Fasteners employees testified that the way Mr. Tobin was setting up the wire draw machine was common place in the industry, and that Mr. Tobin had been taught to set up the machine in this manner. Shamrock Employee Ray Hernandez testified that he did wire draw set ups in the same manner as Mr. Tobin for 18 years while working at a variety of production facilities in the cold header field. *See* Hernandez deposition attached as Plaintiff's Exhibit 7, pages 7–12. Plaintiff ultimately claims that Defendant must have known that it was common place in the industry to set up a wire draw machine in the manner that Mr. Tobin was setting up the machine at the time of his death.

## II. Rule 15(a) and Rule 56(c) Standards

### A. Amend the Pleadings Standard— Rule 15(a)

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend is freely granted where justice so requires. *See* FED. R.CIV.P. 15(a). However, a motion to amend a Complaint should be denied if the amendment is brought in bad faith or for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile. *See Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Prejudice may result from delay, but "[d]elay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining

whether an amendment should be granted." *Brooks v. Celeste,* 39 F.3d 125, 130 (6th Cir.1994) (citing *Head v. Jellico Hous. Auth.,* 870 F.2d 1117, 1123 (6th Cir.1989) (quoting *Hageman v. Signal L.P. Gas, Inc.,* 486 F.2d 479, 484 (6th Cir.1973))).

### B. Summary Judgment Standard— Rule 56(c)

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable infer-

ences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Analysis

### A. Plaintiff's Motion to Amend the Pleadings

■ As set forth above, leave to amend is freely granted where justice so requires. Plaintiff wishes to add a claim that Defendant violated MCLA 600.2949a. This statute provides that:

> In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product, then sections 2946(4) (presumption of due care arising from compliance with governmental standards), 2946a (products liability damages cap), 2947(1) to (4) (defenses of alteration, misuse, voluntary assumption of the risk and sophisticated user), and 2948(2) (open and obvious defense) do not apply.
>
> MCLA 600.2949a

Based on the above quoted statutory language, Plaintiff must establish for the Court that at the time of manufacture or sale by Defendant: (1) the product was defective; (2) that there was substantial likelihood that the defect would cause the injury that is the basis of the action; (3) that Rockford Manufacturing had actual knowledge of said product defect and a substantial likelihood of the type of injury that is the basis of the action; and (4) that Rockford Manufacturing willfully disre-

garded that knowledge in the manufacturing and distribution of its product.

The facts in this case potentially support the above elements of the "wilful disregard of defect" statute listed above. Plaintiff points heavily to the fact that Mr. Tobin was setting up the wire draw machine in a fashion that, while not specifically condoned by the manufacturer, was widely used in the industry and which was how he was taught to operate the machine by his coworkers. Moreover, Plaintiff points out that Defendant was aware of an existing safety device, which was installed on all European delivery models and would have saved Plaintiff's life. Furthermore, Plaintiff contends that this new claim will require no additional discovery or investigation by Defendant.

Given the above facts, which potentially support a willful disregard of defect claim, and that a motion to amend is freely granted, the Court GRANTS Plaintiff's motion to amend complaint.

### B. Defendant's Motion for Summary Judgment

■ There are two statutes that are relevant to the Court's determination of this case. The first sets out the definition of misuse:

> "Misuse" means use of a product in a materially different manner than the product's intended use. Misuse includes uses inconsistent with the specifications and standards applicable to the product, uses contrary to a warning or instruction provided by the manufacturer, seller, or another person possessing knowledge or training regarding the use or maintenance of the product, and uses other than those for which the product would be considered suitable by a reasonably prudent person in the same or similar circumstances.
>
> MCLA 600.2945(e)

The second statute discusses when misuse is reasonably foreseeable to the manufacturer:

A manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable. Whether there was misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the court.

MCLA 600.2947(2)

What becomes apparent from these statutes as they apply to this case is: (1) misuse of a product is an absolute defense for a manufacturer or seller of a product in a product liability action; (2) if the misuse was reasonably foreseeable to the Defendant, the defense is obviated; and (3) the Court must make this determination.

Since it is quite clear that Mr. Tobin was misusing the wire draw at the time of his death, the issue then is whether Mr. Tobin's misuse of the product was reasonably foreseeable to the manufacturer. Defendant points out that since the above quoted Michigan statutes are only recent amendments, no published Michigan appellate decision has construed them. The parties have directed the Court to decisions that predated the statute at issue in this case; however, these statutes provide some discussion on the issue of reasonably foreseeable misuse. In *Shipman v. Fontaine Truck Equipment Co.*, 184 Mich.App. 706, 459 N.W.2d 30 (1990), the Michigan Court of Appeals determined that:

[O]ur reading of the decisions suggests that where there is evidence presented of the manufacturer's knowledge of unsafe use, or that unsafe use is foreseeable, liability is not precluded. Thus, the first criterion has not been satisfied. Additionally, as the trial court noted, there was evidence that the design of the trailer was such that both the removal of the floor grating and use of the trailer with the floor grating out of place were foreseeable from the manufacturer's standpoint. Therefore, under these circumstances, the existence of an employer's safety violation would not be considered unforeseeable as a matter of law so as to relieve a manufacturer of liability for an injury caused by its otherwise defective product. Accordingly, we find that the trial court erred when it concluded that Uckele's unsafe use of the trailer was unforeseeable as a matter of law.

184 Mich.App. at 708, 459 N.W.2d 30

The Court finds that Plaintiff's misuse of this wire draw machine was reasonably foreseeable to the Defendant. To arrive at this conclusion, the Court notes that the way in which Plaintiff was setting up the machine was widely used in the industry; a Shamrock employee, Mr. Hernandez, testified that he set up wire draw machines in the same fashion as Plaintiff in several different machine shops over the course of 18 years.

Furthermore, Defendant manufactured a capstan guard interlock that was specifically designed to prevent the type of injury suffered by Plaintiff. Defendant includes this safety device on all of its European Delivery machines. Since the Court finds that Plaintiff's misuse of this wire draw machine was reasonably foreseeable to Defendant, the Court DENIES Defendant's motion for summary judgment.

## IV. Conclusion

For the reasons stated above, the Court DENIES Defendant's motion for summary judgment, and GRANTS Plaintiff's motion to amend the pleadings.