Lisa MILLER, Plaintiff,

v.

GB SALES & SERVICE,
INC., Defendant.

No. 0270758.

United States District Court,
E.D. Michigan,
Southern Division.

May 13, 2003.

Judith R. Herman, Farmington Hills, MI, for Plaintiff.

Thomas R. Paxton, Garan Lucow, Detroit, MI, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR [PARTIAL] SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

Plaintiff Lisa Miller filed this employment action under the Family Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601–2654, against her previous employer, defendant GB Sales & Service, Inc. ("GB"). Miller claims that GB violated the FMLA by interfering with her rights under the act and by retaliating against her for exercising her rights under the act. Now before the court are the parties' cross-motions for summary judgment, in which the parties seek summary judgment as to GB's liability only. For the following reasons, the court grants Miller's motion for summary judgment and denies GB's motion.

## I. Factual Background

GB is a distributor of Mitsubishi material handling equipment, including lift trucks and fork lifts. *See* Def.'s Mot. at 2. GB also provides warranty and retail service work for that equipment. *See id.* Miller began working for GB as an administrative assistant/service secretary on July 7, 1999. *See* Compl. ¶ 4. Miller's immediate supervisor in this position was Dale Duke, GB's service manager.

Miller was diagnosed with Diabetes Mellitus Type I sometime in the early 1990's. *See* Pl.'s Mot. Ex. 1 at 64 (Miller Dep.); Compl. ¶ 5. Beginning in July 2000, Miller also began suffering from depression. *See* Pl.'s Mot. Ex. 1 at 63. Miller informed Duke and several other supervisors that she was diabetic early in her career at GB. *See id.* at 105–06; *See* Pl.'s Mot. Ex. 2 at 74–75 (Duke Dep.)(acknowledging that Miller informed him of her diabetes a few months after she started working at GB). Shortly after July 2000, when Miller began experiencing uncontrollable crying spells related to her depression, she informed Duke that she was suffering from depression and that she was receiving therapy and medication for her condition. *See* Pl.'s Mot. Ex. 1 at 63–4; 72–73.

In late October 2000, Duke completed his bi-annual review of Miller's performance.[1] *See* Pl.'s Mot. Ex. 7 & Ex. 38. In his evaluation, Duke commends Miller for doing "a fine job" and he requests that she receive a $1.50 per hour wage increase, thereby raising her wage to $14.00 per hour. *See id.* Ex. 7. Miller also completed an evaluation of her performance in preparation for her review. *See id.* Ex. 38. On that evaluation, Miller rates herself as "proficient" (a rating of 3 out of 4) "with respect to dependability" and "distinguished" (a rating of 4 out of 4) with respect to punctuality. Duke reviewed Miller's self-evaluation and signed off on it to indicate his agreement with her assessment. *See id.* Ex. 38 & Ex. 2 at 130–31 (Duke's testimony that he believed the evaluation was accurate and that he agreed with it).

Duke testified that GB utilizes a four-step progressive discipline program that applies to attendance and tardiness issues. *See* Pl.'s Mot. Ex. 2 at 55–57. Duke described how this program works: first an employee receives a verbal warning; then the employee is given a written warning; after a third violation the employee is suspended for a period of time; finally he or she is terminated. *See id.* Any discipline of an employee is noted in his or her personnel file. *See id.* at 57.

Beginning in November 2000, Miller became ill on a number of occasions and she began experiencing complications associated with her diabetes. From November 6 through 14, Miller was absent from work due to gastroenteritis that was causing her to vomit and, as a result, was impacting her diabetes. *See* Pl's Mot. at 3 & Ex. 8 ¶¶ 7–10. Specifically, Miller's blood sugar levels were "bouncing all over" and her vision was blurred. *See id.* Miller called in sick every day from the 6 through 10,

---

1. GB contends that Exhibit D to its motion is Duke's evaluation of Miller at the end of October 2000, where Duke raised serious concerns about Miller's attendance. *See* Def.'s Mot. Ex. D. Miller claims, however, that this document was neither presented to nor discussed with her at her review. *See* Pl.'s Resp. at 2. She states that her attendance was not raised as an issue at this review. In fact, it is clear that Exhibit D was prepared sometime after Miller's October 2000 review. The document reflects Miller's last "Review and increase" in "10/00 $1.5" and her "current wage" after that increase of $14.00. Nevertheless, as GB claims that it terminated Miller due to excessive absenteeism beginning in November 2000, it is not relevant whether GB complained of her absences at or prior to her October 2000 review.

indicating that she had the flu and couldn't eat. *See* Pl.'s Mot. Ex. 2 at 154–56. When Miller spoke with Duke on the 10, she told him that her doctor advised that she remain at home until the 13. *See id.* at 156. Miller called Duke on the 13, however, and indicated that while her fever was gone she still was having vision problems. *See id.* Miller told Duke that she expected to return to work the next day. *See id.*

Miller in fact returned to work on the 14, and she brought doctors' notes excusing her from work on the days she was absent. *See id.* at 154; Pl.'s Mot. Ex. 12 & Ex. 13. Although Miller returned to work on the 14, she arrived late and left early because (as she explained to Duke) she still was experiencing vision and sugar problems.[2] *See id.* at 161. Miller came to work on the 15; however she again arrived late and left early because of her vision and sugar problems. *See id.* That day, Miller went to see her doctor, David Peters. *See* Pl.'s Mot. Ex. 8 ¶ 9. Dr. Peters, concluded that Miller's problems were related to her diabetes and he indicated this on a note for GB. *See id.*

Miller did not report to work on November 16 or 17. On the 17 she returned to see Dr. Peters because she still was experiencing high blood sugar levels and blurred vision. *See id.* ¶ 10. Dr. Peters again attributed Miller's condition to her diabetes and he provided her with a note excusing her from work on the 16 and 17. *See id.;* Pl.'s Mot. Ex. 15.

Miller returned to work on November 20, although she arrived late and continued having vision problems. Miller worked the following three days, although Duke noted that she was arriving late and appeared "very shaky." *See* Pl.'s Mot. Ex. 2 at 165–66. On November 27, Miller called work and informed Duke that her sugar levels were elevated again and that she was go-ing to call her doctor. *See id.* at 171. She came to work at 11:00 a.m., but then left early promising to be in early the next day. *See id.*

After leaving work, Miller went to see Dr. Peters complaining that she was experiencing headaches and periods of shakiness and blurred vision. *See* Pl.'s Mot. Ex. 8 ¶ 11. Dr. Peters again concluded that Miller's problems were a result of her diabetes and he altered her diabetes medication. *See id.* Miller returned to Dr. Peters' office on November 30. *See id.* At that time her blood sugar levels had declined but she still was experiencing vision problems. *See id.* ¶ 12. Dr. Peters provided Miller with a note excusing her absences from work from November 27 through December 1. *See id.; See* Pl.'s Mot. Ex. 16. Dr. Peters wrote that Miller's absences were due to her diabetes. *See id.*

Miller eventually returned to work on December 5, although she still was having trouble seeing. Duke asked to speak with Miller's doctor about her condition and thus Miller arranged for Dr. Peters to call GB. Miller claims, however, that when Dr. Peters returned her phone call, Duke refused to speak to him. *See* Pl.'s Mot. Ex. 1 at 78. Another supervisor, Donald Gephardt, took Dr. Peters' call. *See* Pl.'s Mot. Ex. 19. According to Gephardt, Dr. Peters stated that Miller was experiencing vision problems related to medication adjustment and was not able to fully perform her duties as a result. *See id.* After the telephone call, Gephardt told Miller that he would go home if he could not perform his duties and so Miller left work. *See id.*

Miller reported to work early the next morning. *See* Pl.'s Mot. Ex. 2 at 192. Concerned about her vision problems, Duke asked Miller if she would undergo a

2. Apparently Miller came in late so that she did not have to drive in the dark.

fitness evaluation at Concentra Medical Center ("Concentra"); she agreed. *See id.* Duke drove Miller to Concentra because she indicated she could not see to drive. *See id.* Duke also filled out Miller's paperwork at Concentra because she could not do so. *See id.*

Dr. Donald Speyer examined Miller at Concentra and diagnosed her as diabetic. *See* Pl.'s Mot. Ex. 20. Finding Miller's condition non-work related, Dr. Speyer advised her to continue treatment with her family physician but not to work or to drive until her blurred vision and dizziness were gone. *See id.* Dr. Speyer subsequently conveyed his findings and recommendation to Duke over the telephone. *See id.;* Pl.'s Mot. Ex. 2 at 165.

As Dr. Speyer instructed, Miller returned to see Dr. Peters on December 7. Although Miller's vision still was "fuzzy," Dr. Peters prepared a noted indicating that she could return to work on December 11 without restrictions. *See* Pl.'s Mot. Ex. 8 ¶ 14; Ex. 21. Thus Miller returned to work on the 11. Because she still was experiencing some vision problems, however, Miller waited until it was light outside to drive and thus she was late to work.

When Miller arrived at GB, Duke and Roger Runyan, GB's Comptroller and Human Resources Director, asked her why she could not drive in the dark when Dr. Peters' note indicated that she could return to work "without restrictions." *See* Pl.'s Mot. Ex. 22 & Ex. 23. Duke and Runyan instructed Miller to return to Dr. Peters to obtain clarification as to her medical condition. *See id.* According to Runyan's notes, he advised Miller to obtain a detailed letter from her doctor outlining her medical restrictions and to provide the letter to Duke so GB could assess "what can be done if anything to accommodate" her. *See* Pl.'s Mot. Ex. 23. Runyan told Miller not to return to work until instructed by GB. *See id.* According to Duke's notes, he told Miller that she should take time off until she fully recovered from her current medical condition. *See* Pl.'s Mot. Ex. 22.

Miller returned to work on December 13 with a note from Dr. Peters indicating that it was okay for her to work but she could not drive at night. *See* Pl.'s Mot. Ex. 24. Thereafter, Miller worked from December 13 through February 17, 2001, although she missed two to four days during that period as a result of medical problems unrelated to her diabetes.[3] *See* Pl.'s Mot. at 8 ¶¶ 16 & 17.

On Saturday, February 17, Miller saw Dr. Peters' partner, Dr. Joseph Beaman, complaining of insomnia and panic attacks. *See* Pl.'s Mot. Ex. 8 ¶ 18. Dr. Beaman determined that Miller's problems were associated with her depression and he prescribed two medications, Paxil and Klonopin. *See id.* Miller returned to work on February 20, although she told Duke that she was vomiting and feeling ill.[4] *See* Pl.'s Mot. Ex. 2 at 252–53. Duke advised Miller to go home or see her doctor.

Miller saw Dr. Peters the next day. Dr. Peters diagnosed Miller as suffering from dehydration as a result of the medication for her depression and diabetes. *See* Pl.'s Mot. Ex. 8 ¶ 19. Miller called GB the next day, February 22, to indicate that she still was ill; although she told Duke she only

---

3. In early January 2001, Miller had a urinary tract infection, although Dr. Peters noted that such an infection can complicate diabetes by causing an increase in blood sugar. *See* Pl.'s Mot. Ex. 8 ¶ 16. On January 24, Miller missed work and saw Dr. Peters due to a rash on her face. *See id.* ¶ 17. Miller also was

injured at work on February 12, and she recalls that she may have missed part of the day as a result. *See* Pl.'s Mot. Ex. 27.

4. It is not clear from the record whether Miller was scheduled to work February 19.

had the flu. *See* Pl.'s Mot. Ex. 2 at 254. According to Duke, Miller also told him that she only spoke to her doctor on the phone and he indicated that if she merely had the flu, he did not need to see her. *See id.*

On February 23, Miller called GB and said that she still was too ill to work. The next work day, February 26, Miller left a message at GB that she was going to see her doctor at 11:15, she had fainted two times the night before, but that she would be in the next day. *See id.* at 255. At her appointment, Dr. Peters provided Miller with a note excusing her from work from February 20–26 due to illness and indicating that she could return to work on February 27.

Miller, however, did not return to work on the 27. Her mother called GB at 6:54 a.m. and indicated that Miller had passed out two times the night before and was going to the hospital. *See* Pl.'s Mot. Ex. 2 at 257. Miller's mother called GB again at 10:30 and spoke directly with Duke. *See id.* At that time she said that Miller instead was going to see her doctor; although the record indicates Miller only saw Dr. Peters on the 28. *See id.;* Pl.'s Mot. Ex. 8 ¶ 20.

At her February 28 appointment with Dr. Peters, Miller stated that she was experiencing dizziness and passing out. *See id.* Dr. Peters diagnosed Miller as suffering from a "hypoglycemic reaction due to the medication (Glucophage) and insufficient fluld intake" and that her "[d]iabetes was a factor contributing to her problems." *See id.* Dr. Peters also diagnosed Miller as suffering from a panic disorder resulting from depression. *See id.* Dr. Peters provided Miller with a note, that Miller provided GB, indicating that she was being seen and treated for

Syncope and should be excused from work from February 27 through March 5.[5] *See id.;* Pl.'s Mot. Ex. 29.

On March 1, Miller went to the emergency room at Henry Ford Wyandotte Hospital because she continued to experience dizziness and fainting spells. *See* Pl.'s Mot. Ex. 29. Sometime that morning, Miller's mother called GB and left a message for Duke that she was taking Miller to the emergency room because "she keeps passing out." *See id.* Ex. 30. According to Duke, Miller called him at work at 6:45 p.m. and told him that she went to the hospital but was not admitted for insurance reasons, although her blood sugar levels were "way out of whack." *See id.*

On March 5, Duke recommended and GB's President Gregory Blackwood agreed that Miller should be terminated due to "excessive absenteeism." *See* Pl.'s Mot. Ex. 31 & Ex. 2 at 276–77. Blackwood testified that he "never gave the FMLA any thought" as to whether it applied to Miller's absences; although Runyan testified that he believed the act applied to Miller's situation. *See* Pl.'s Mot. Ex. 34 at 7–11; Ex. 10 at 141–42. When Miller attempted to return to work on March 7, Duke informed her that she had been terminated. *See* Pl.'s Mot. Ex. 2 at 275–76. That day Miller sent GB a letter asking that she be reinstated pursuant to the FMLA. *See id.* Ex. 32. GB denied her request.

## II. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry

---

5. "Syncope" is defined as "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." RICHARD SLOANE, THE SLOANE-DORLAND ANNOTATED MEDI-

CAL-LEGAL DICTIONARY (West 1987). "Ischemia" is defined as "a low oxygen state usually due to obstruction of the arterial blood supply or inadequate blood flow." *Id.*

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Applicable Law and Analysis

The FMLA grants eligible employees as many as twelve weeks of leave during a one-year period if, among other things, they have a "serious health condition that makes the employee unable to perform the functions of the position of such employee."[6] 29 U.S.C. § 2612(a)(1)(D). The Act prohibits an employer from interfering with an employee's right to take medical leave, 29 U.S.C. § 2615(a)(1); and it prohibits an employer from retaliating against an employee for exercising his or her rights under the Act. 29 U.S.C. § 2615(a)(2). Miller moves for summary judgment on her interference and retaliation claims arguing that there are no genuine factual disputes and that she is entitled to judgment as a matter of law. GB seeks summary dismissal of Miller's claims, arguing that she failed to provide proper notice prior to her absences.

When an employee's need for leave under the FMLA is foreseeable, the Act requires the employee to provide notice to the employer, expressing the employee's intention to take a leave of absence. 29 U.S.C. § 2612(e)(1). When the necessity for leave is foreseeable based on planned medical treatment, the employee must provide the employer with at least thirty days notice of the employee's intent to take leave. 29 U.S.C. § 2612(e)(2)(B). That provision further provides, however, that "if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." *Id.*

---

6. The parties do not dispute that Miller is an eligible employee: she was employed at GB for at least twelve months at the time GB claims her absenteeism became a problem and presumably worked at least 1,250 hours during that period. *See* 29 U.S.C. § 2611(2). Nor do the parties dispute that GB is an employer subject to the act. *See* 29 U.S.C. § 2611(4). Finally, GB does not argue that Miller's absences were not related to serious health conditions as defined by the statute. Clearly most of her absences were related to her diabetes and/or depression.

The Act is silent as to the requirement of notice when the need for leave is unforeseeable. The federal regulations governing the FMLA provide, however, that in such instances notice is to be provided "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). That section further states that employees should give notice to employers "within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." *Id.* The regulations further provide that "[i]n the case of a medical emergency requiring leave because of an employee's own serious health condition ... written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved." *Id.*

The regulations also explain how notice may be provided. Notice may be provided "in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means." 29 C.F.R. § 825.303(b). If the employee is unable to personally provide notice, notice may be given by his or her "spokesperson" (e.g., spouse, adult family member or other responsible party). *Id.*

An employee need not expressly invoke the FMLA to his or her employer in order to meet the Act's notice requirement. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir.1999)(citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 761 (5th Cir.1995)). The employee only needs to state that leave is needed for medical reasons or a birth or adoption, for example. 29 C.F.R. § 825.302(c). The burden then shifts to the employer to inquire further of the employee to determine whether FMLA leave is being sought and to obtain the necessary details of the leave being taken. *Id.* As the regulations provide, "in the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave." *Id.*

■ GB argues that the law did not require it to designate every one of Miller's absences as FMLA leave merely because her supervisors were aware of Miller's diabetes and depression. In the same vein GB contends that the law did not grant Miller the right to miss work whenever she wished merely because she suffered from diabetes and depression. GB is correct that Miller may not have been entitled to FMLA leave for every one of her absences and that she was not entitled to unscheduled and unpredictable absences just because she suffered from serious health conditions.[7] What GB fails to understand, however, is that its knowledge of Miller's serious health conditions placed the burden on it to inquire further whenever Miller called in sick for medical reasons to determine if those reasons were FMLA-qualifying.

In support of its interpretation of the law, GB cites the following language from *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir.2002):

> [T]he FMLA does not provide an employee suffering from depression with a right to "unscheduled and unpredictable, but cumulatively substantial, absences" or a right to "take unscheduled leave at a moment's notice for the rest of her career." On the contrary, such a situation "implies that she is not qualified for a position where reliable attendance is a bona fide requirement ...."

---

7. For example, Miller's December 13, 2000, absence due to a urinary tract infection and her February 17, 2001, absence due to a rash most likely do not qualify as leave due to "serious health conditions."

*Id.* at 853 (quoting *Collins v. NTN–Bower Corp.*, 272 F.3d 1006, 1007 (7th Cir.2001)). The court's statement, however, was pure dicta. In fact despite this language, the Eighth Circuit held that the plaintiff provided sufficient notice to her employer that her "unscheduled and unpredictable" absences were due to her depression to create a genuine issue of material fact with regard to whether she provided appropriate notice. *Id.* at 852. The court reached this conclusion because it found that the plaintiff presented a great deal of evidence to demonstrate that she informed several of her supervisors of her mental condition throughout her employment and thus she put her employer on notice that her absences possibly qualified as FMLA-leave. *Id.* As the court stated, "[w]hen an employee provides the employer with notice that she may be in need of FMLA leave ... it then becomes the employer's duty to determine whether or not the employee actually requires FMLA leave if there is some doubt as to whether or not the request would qualify." *Spangler*, 278 F.3d at 853.

There is no dispute that GB was aware of Miller's physical and mental conditions prior to the absences for which Duke and Blackwood decided to terminate her. On the days that she failed to report to work, Miller, at a minimum, told someone at GB that she was ill or would not be in for medical reasons. She also provided GB with doctors' notes indicating that she should be excused from work. With respect to most of her absences, Miller also provided her supervisors with enough information for them to conclude that she was experiencing problems related to her diabetes and/or depression. The plaintiff in *Spangler*, in comparison, provided her employer with no explanation for her absences, aside from the absence immediately before her termination when she said she would not be in that day because it was "depression again" and one absence

where she said she could not come in due to transportation problems. *Id.* at 852. On the other days when she failed to report to work, the plaintiff merely left a message early in the morning on the employer's answering machine stating only that she would not be in that day.

■ GB was aware that Miller suffered from diabetes and depression and Miller informed GB that her absences were medically related. The FMLA and the regulations then placed the burden on GB to request and/or gather the information necessary for it to determine whether her absences were due to those serious health conditions and thus qualified as FMLA-leave. The court therefore finds that Miller provided sufficient notice under the FMLA and is entitled to summary judgment on her interference claim.

GB argues that Miller's retaliation claim must fall because Miller only asked GB to consider her leave as FMLA-qualifying leave after she was terminated. In other words, GB claims that since it terminated Miller before she requested that her leave be considered FMLA leave, it could not be retaliating against her for exercising her FMLA rights. In support of this position, GB cites *Hammon v. DHL Airways, Inc.*, 165 F.3d 441 (6th Cir.1999), and *Brohm v. JH Properties, Inc.*, 149 F.3d 517 (6th Cir.1998). In both cases, however, the plaintiffs never requested any leave prior to their terminations nor provided any information to their employers prior to termination to indicate that they suffered from serious medical conditions and needed leave. Miller, in comparison, requested and took leave prior to her termination and provided GB information to indicate that her need for leave was related to her diabetes and/or depression.

In *Brohm*, a hospital (the defendant) terminated one of its anesthesiologists (the plaintiff) on June 27, 1995, with 120–days

written notice, because of complaints that he was sleeping during surgical procedures. *Brohm*, 149 F.3d at 519. The hospital confronted the doctor approximately two months later after additional complaints were filed alleging that he slept through surgeries. At this time the doctor mentioned that he was seeking medical consultation regarding the possibility that he was suffering from chronic sleep deprivation. The next day, the hospital decided to make the doctor's termination effective immediately. A week later, the doctor underwent a sleep study which revealed that he in fact suffered from severe chronic sleep deprivation secondary to obstructive sleep apnea.

The hospital filed a motion for summary judgment which the district court granted. The court of appeals affirmed. First, the court held that the doctor was not an "eligible employee" under the FMLA at the time he received medical attention for his condition, as he already had been terminated one week earlier. *Id.* at 523. Second, the court held that there was no evidence that the doctor even requested medical leave prior to his termination. *Id.*

Similarly in *Hammon*, a commercial pilot (the plaintiff) undergoing additional flight training began experiencing nervousness and anxiety after he crashed a simulated plane and his flight instructor reprimanded him. Because of his problems in flight training, the plaintiff informed his supervisor that he intended to resign. *Hammon*, 165 F.3d at 446. According to the plaintiff, his supervisor told him that he was an employee the company wanted to keep, offered to change his flight instructor, and suggested that he go home and consider his decision. The supervisor told the plaintiff that he would not submit his resignation for twenty-four hours, but if he did not hear from plaintiff by noon the next day, he would begin processing his resignation. During the next four days the plaintiff neither called his supervisor nor continued in his flight training class.

During that period, the plaintiff saw an internist who examines flight pilots for Federal Aviation Association ("FAA") certification. The internist diagnosed the plaintiff as suffering from high blood pressure and nervousness, likely caused by emotional problems. The doctor informed the employer that the plaintiff was too anxious to fly, that he should be checked out by an FAA physician, and that it would take him more than a month to recover. When the plaintiff subsequently contacted his supervisor to inform him of the internist's findings, the supervisor told the plaintiff that his condition was immaterial to the employer since he already had resigned.

The Sixth Circuit concluded that prior to submitting his resignation, the plaintiff failed to provide his employer with any information for it to conclude that he was suffering from a serious medical condition. *Id.* at 451. Thus the court found that the plaintiff failed to show that he requested a leave under the FMLA to address his nervous condition prior to his resignation. *Id.* Because an employee cannot bring a claim under the FMLA unless he notifies his employer of his condition and requests relief during his employment, the court held that the district court properly concluded that the plaintiff could not establish his claim. *Id.*

Miller clearly demonstrates that she engaged in an activity protected by the FMLA. GB knew or should have known that at least the majority of Miller's absences were protected under the Act, as they were necessitated by serious medical conditions. GB admits that it terminated Miller for "excessive absenteeism" and that it made no effort to determine whether any of her absences were protected

under the FMLA.[8] Miller therefore is entitled to summary judgment on her retaliation claim.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Plaintiff's motion for summary judgment as to defendant's liability is Granted; defendant's motion for summary judgment is **Denied.**

---

8. In its pleadings GB states that it decided to terminate Miller because she "could not perform the essential functions of her job," GB contends that an employee who is unable to perform the essential functions of a job is not entitled to intermittent or reduced schedule leave under the FMLA. The evidence is clear, however, that GB's sole reason for terminating Miller was excessive absenteeism. Nevertheless, intermittent leave or a reduced schedule in order to treat or attend to a serious medical condition that renders an employee unable to perform his or her job is exactly what the leave time provision under the FMLA structure is designed for. *See Spangler,* 278 F.3d at 851 (finding that the FMLA, compared to the ADA, is designed to protect the employee who is "unable to perform the functions of the position of the employee" from losing her position during the leave period which is "[e]ssentially ... an opportunity for the employee to treat or attend to the condition rendering her unable to perform her job.")